[Civ. No. 45562. Second Dist., Div. Two. May 18, 1976.]

L. GENE ALLARD, Plaintiff, Cross-defendant and Respondent, v.
CHURCH OF SCIENTOLOGY OF CALIFORNIA,
Defendant, Cross-complainant and Appellant.

442

COUNSEL

Morgan, Wenzel & McNicholas, John P. McNicholas, Gerald E. Agnew, Jr., and Charles B. O'Reilly for Plaintiff, Cross-defendant and Respondent.

Levine & Krom, Meldon E. Levine, Murchison, Cumming, Baker & Velpmen, Murchison, Cumming & Baker, Michael B. Lawler, Tobias C. Tolzmann and Joel Kreiner for Defendant, Cross-complainant and Appellant.

OPINION

BEACH, J.—L. Gene Allard sued the Church of Scientology for malicious prosecution. Defendant cross-complained for conversion. A jury verdict and judgment were entered for Allard on the complaint for $50,000 in compensatory damages and $250,000 in punitive damages. Judgment was entered for Allard and against the Church of Scientology on the cross-complaint. Defendant-cross complainant appeals from the judgment.

FACTS:

The evidence in the instant case is very conflicting. We relate those facts supporting the successful party and disregard the contrary showing. (*Nestle* v. *City of Santa Monica,* 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

In March 1969, L. Gene Allard became involved with the Church of Scientology in Texas. He joined Sea Org in Los Angeles and was sent to San Diego for training. While there, he signed a billion-year contract agreeing to do anything to help Scientology and to help clear the planet of the "reactive people." During this period he learned about written policy directives that were the "policy" of the church, emanating from L. Ron Hubbard, the founder of the Church of Scientology.[1] After training on the ship, respondent was assigned to the Advanced Organization in Los Angeles, where he became the director of disbursements. He later became the Flag Banking Officer.

[1]One such policy, to be enforced against "enemies" or "suppressive persons" was that formerly titled "fair game." That person "[m]ay be deprived of property or injured by any means by any Scientologist without any discipline of the Scientologist. May be tricked, sued or lied to or destroyed." (Exhibit 1.)

Alan Boughton, Flag Banking Officer International, was respondent's superior. Only respondent and Boughton knew the combination to the safe kept in respondent's office. Respondent handled foreign currency, American cash, and various travelers' checks as part of his job.

In May or June 1969, respondent told Boughton that he wanted to leave the church. Boughton asked him to reconsider. Respondent wrote a memo and later a note; he spoke to the various executive officers. They told him that the only way he could get out of Sea Org was to go through "auditing" and to get direct permission from L. Ron Hubbard. Respondent wrote to Hubbard. A chaplain of the church came to see him. Lawrence Krieger, the highest ranking justice official of the church in California, told respondent that if he left without permission, he would be fair game and "You know we'll come and find you and we'll bring you back, and we'll deal with you in whatever way is necessary."

On the night of June 7 or early morning of June 8, 1969, respondent went to his office at the Church of Scientology and took several documents from the safe. These documents were taken by him to the Internal Revenue Service in Kansas City; he used them to allege improper changes in the records of the church. He denies that any Swiss francs were in the safe that night or that he took such Swiss francs. Furthermore, respondent denies the allegation that he stole various travelers' checks from the safe. He admitted that some travelers' checks had his signature as an endorsement, but maintains that he deposited those checks into an open account of the Church of Scientology. There is independent evidence that tends to corroborate that statement. Respondent, having borrowed his roommate's car, drove to the airport and flew to Kansas City, where he turned over the documents to the Internal Revenue Service.

Respondent was arrested in Florida upon a charge of grand theft. Boughton had called the Los Angeles Police Department to report that $23,000 in Swiss francs was missing. Respondent was arrested in Florida; he waived extradition and was in jail for 21 days. Eventually, the charge was dismissed. The deputy district attorney in Los Angeles recommended a dismissal in the interests of justice.[2]

---

[2]Leonard J. Shaffer, the deputy district attorney, testified outside the presence of the jury that members of the church were evasive in answering his questions. He testified that the reasons for the dismissal were set forth in his recommendation; the dismissal was not part of a plea bargain or procedural or jurisdictional issue.

CONTENTIONS ON APPEAL:

1. Respondent's trial counsel engaged in flagrant misconduct throughout the proceedings below and thereby deprived appellant of a fair trial.

2. The verdict below was reached as a result of (a) counsel's ascription to appellant of a religious belief and practices it did not have and (b) the distortion and disparagement of its religious character, and was not based upon the merits of this case. To allow a judgment thereby achieved to stand would constitute a violation of appellant's free exercise of religion.

3. Respondent failed to prove that appellant maliciously prosecuted him and therefore the judgment notwithstanding the verdict should have been granted.

4. The refusal of the trial court to ask or permit voir dire questions of prospective jurors pertaining to their religious prejudices or attitudes deprived appellant of a fair trial.

5. It was prejudicial error to direct the jury, in its assessment of the malicious prosecution claim, to disregard evidence that respondent stole appellant's Australian and American Express travelers' checks.

6. The order of the trial court in denying to appellant discovery of the factual basis for the obtaining of a dismissal by the district attorney of the criminal case People v. Allard was an abuse of discretion and a new trial should be granted and proper discovery permitted.

7. Respondent presented insufficient evidence to support the award of $50,000 in compensatory damages which must have been awarded because of prejudice against appellant.

8. Respondent failed to establish corporate direction or ratification and also failed to establish knowing falsity and is therefore not entitled to any punitive damages.

9. Even if the award of punitive damages was proper in this case, the size of the instant reward, which would deprive appellant church of more

than 40 percent of its net worth, is grossly excessive on the facts of this case.

10. There was lack of proper instruction regarding probable cause.[3]

DISCUSSION:

1. *There was no prejudicial misconduct by respondent's trial counsel, and appellant was not deprived of a fair trial.*

Appellant claims that it was denied a fair trial through the statements, questioning, and introduction of certain evidence by respondent's trial counsel. *Love* v. *Wolf,* 226 Cal.App.2d 378 [38 Cal.Rptr. 183], is cited as authority.

We have reviewed the entire record and find appellant's contentions to be without merit. Several of counsel's individual statements and questions were inappropriate. However, there often were no objections by counsel for appellant where an objection and subsequent admonition would have cured any defect; or there was an objection, and the trial court judiciously admonished the jury to disregard the comment. Except for these minor and infrequent aberrations, the record reveals an exceptionally well-conducted and dispassionate trial based on the evidence presented.

As in *Stevens* v. *Parke, Davis & Co.,* 9 Cal.3d 51, 72 [107 Cal.Rptr. 45, 507 P.2d 653], a motion for a new trial was made, based in part upon the alleged misconduct of opposing counsel at trial. ■ What was said in *Stevens* applies to the instant case. " 'A trial judge is in a better position than an appellate court to determine whether a verdict resulted wholly, or in part, from the asserted misconduct of counsel and his conclusion in the matter will not be disturbed unless, under all the circumstances, it is plainly wrong.' [Citation.] From our review of the instant record, we agree with the trial judge's assessment of the conduct of plaintiff's counsel and for the reasons stated above, we are of the opinion that defendant has failed to demonstrate prejudicial misconduct on the part of such counsel." (*Stevens* v. *Parke, Davis & Co., supra,* 9 Cal.3d at p. 72.)

2. *The procedure and verdict below does not constitute a violation of appellant's First Amendment free exercise of religion.*

[3]This issue is raised for the first time in appellant's reply brief.

■ Appellant contends that various references to practices of the Church of Scientology were not supported by the evidence, were not legally relevant, and were unduly prejudicial. The claim is made that the trial became one of determining the validity of a religion rather than the commission of a tort.

The references to which appellant now objects were to such practices as "E-meters," tin cans used as E-meters, the creation of religious doctrine purportedly to "get" dissidents, and insinuations that the Church of Scientology was a great money making business rather than a religion.

The principal issue in this trial was one of credibility. If one believed defendant's witnesses, then there was indeed conversion by respondent. However, the opposite result, that reached by the jury, would naturally follow if one believed the evidence introduced by respondent. Appellant repeatedly argues that the introduction of the policy statements of the church was prejudicial error. However, those policy statements went directly to the issue of credibility. Scientologists were allowed to trick, sue, lie to, or destroy "enemies." (Exhibit 1.) If, as he claims, respondent was considered to be an enemy, that policy was indeed relevant to the issues of this case. That evidence well supports the jury's implied conclusion that respondent had not taken the property of the church, that he had merely attempted to leave the church with the documents for the Internal Revenue Service, and that those witnesses who were Scientologists or had been Scientologists were following the policy of the church and lying to, suing and attempting to destroy respondent. Evidence of such policy statements were damaging to appellant, but they were entirely relevant. They were not prejudicial. A party whose reprehensible acts are the cause of harm to another and the reason for the lawsuit by the other cannot be heard to complain that its conduct is so bad that it should not be disclosed. The relevance of appellant's conduct far outweighs any claimed prejudice.[4]

We find the introduction of evidence of the policy statements and other peripheral mention of practices of the Church of Scientology not to be error. In the few instances where mention of religious practices may have been slightly less germane than the policy statements regarding fair game, they were nonetheless relevant and there was no prejudice to appellant by the introduction of such evidence.

---

[4]The trial court gave appellant almost the entire trial within which to produce evidence that the fair game policy had been repealed. Appellant failed to do so, and the trial court thereafter permitted the admission of Exhibit 1 into evidence.

*3. The trial court properly denied the motion for judgment notwithstanding the verdict.*

■ Appellant claimed that it had probable cause to file suit against respondent. The claim is made that even if Alan Boughton did take the checks from the safe, knowledge of that act should not be imputed to appellant church.

Based on the policy statements of appellant that were introduced in evidence, a jury could infer that Boughton was within the scope of his employment when he stole the francs from the safe or lied about respondent's alleged theft. Inferences can be drawn that the church, through its agents, was carrying out its own policy of fair game in its actions against respondent. Given that view of the evidence, which as a reviewing court we must accept, there is substantial evidence proving that appellant maliciously prosecuted respondent. Therefore, the trial court did not err in denying the motion for the judgment notwithstanding the verdict.

*4. The trial court performed proper voir dire of prospective jurors.*

■ Appellant claims that the trial court refused to ask or permit voir dire questions of prospective jurors pertaining to their religious prejudices or attitudes. The record does not so indicate. Each juror was asked if he or she had any belief or feeling toward any of the parties that might be regarded as a bias or prejudice for or against any of them. Each juror was also asked if he or she had ever heard of the Church of Scientology. If the juror answered affirmatively, he or she was further questioned as to the extent of knowledge regarding Scientology and whether such knowledge would hinder the rendering of an impartial decision. One juror was excused when she explained that her husband is a clergyman and that she knows a couple that was split over the Church of Scientology.

■ The trial court's thorough questioning served the purpose of voir dire, which is to select a fair and impartial jury, not to educate the jurors or to determine the exercise of peremptory challenges. (*Rousseau v. West Coast House Movers,* 256 Cal.App.2d 878, 882 [64 Cal.Rptr. 655].)

*5. It was not prejudicial error to direct the jury, in its assessment of the malicious prosecution claim, to disregard evidence that respondent stole appellant's Australian and American Express travelers' checks.*

■ Appellant submits that evidence of respondent's purported theft of the Australian and American Express travelers' checks should have been admitted as to the issue of malicious prosecution as well as the cross-complaint as to conversion. If there were any error in this regard, it could not possibly be prejudicial since the jury found for respondent on the cross-complaint. It is evident that the jury did not believe that respondent stole the travelers' checks; therefore, there could be no prejudice to appellant by the court's ruling.

*6. Appellant suffered no prejudice by the trial court's denial of discovery of the factual basis for obtaining of the dismissal by the district attorney.*

■ Prior to trial, appellant apparently sought to discover the reasons underlying the dismissal of the criminal charges against respondent. This was relevant to the instant case since qne of the elements of a cause of action for malicious prosecution is that the criminal prosecution against the plaintiff shall have been favorably terminated. (*Jaffe* v. *Stone,* 18 Cal.2d 146 [114 P.2d 335, 135 A.L.R. 775].)

Whether or not the lower court was justified in making such an order, the denial of discovery along these lines could not be prejudicial. During the trial, counsel for all parties stipulated that the criminal proceedings against Allard were terminated *in his favor* by a dismissal by a judge of that court upon the recommendation of the district attorney.

In addition, there was a hearing outside the presence of the jury in which the trial court inquired of the deputy district attorney as to the reasons for the dismissal. It was apparent at that time that the prospective witnesses for the Church of Scientology were considered to be evasive. There was no prejudice to appellant since the deputy district attorney was available at trial. Earlier knowledge of the information produced would not have helped defendant. We find no prejudicial error in the denial of this discovery motion.

*7. The award of $50,000 compensatory damages was proper.*

Appellant contends that based upon the evidence presented at trial, the compensatory damage award is excessive. In addition, appellant contends that the trial court erred in not allowing appellant to introduce evidence of respondent's prior bad reputation.

 There was some discussion at trial as to whether respondent was going to claim damaged reputation as part of general damages. The trial court's initial reaction was to allow evidence only of distress or emotional disturbance; in return for no evidence of damaged reputation, appellant would not be able to introduce evidence of prior bad reputation. The court, however, relying on the case of *Clay* v. *Lagiss,* 143 Cal.App.2d 441 [299 P.2d 1025], held that lack of damage to reputation is not admissible. Therefore, respondent was allowed to claim damage to reputation without allowing appellant to introduce evidence of his prior bad reputation.

In matters of slander that are libelous per se, for example the charging of a crime, general damages have been presumed as a matter of law. (*Douglas* v. *Janis,* 43 Cal.App.3d 931, 940 [4] [118 Cal.Rptr. 280], citing *Clay* v. *Lagiss, supra,* 143 Cal.App.2d at p. 448. Compare *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997].)[5] Damages in malicious prosecution actions are similar to those in defamation. Therefore, damage to one's reputation can be presumed from a charge, such as that in the instant case that a person committed the crime of theft. In any event, as the trial court in the instant case noted, there was no offer of proof regarding respondent's prior bad reputation; any refusal to allow possible evidence on that subject has not been shown to be error, much less prejudicial error.

 Appellant further contends that the amount of compensatory damages awarded was excessive and that the jury was improperly instructed regarding compensatory damages. The following modified version of BAJI Nos. 14.00 and 14.13 was given:

"If, under the court's instructions, you find that plaintiff is entitled to a verdict against defendant, you must then award plaintiff damages in an amount that will reasonably compensate him for each of the following elements of loss or harm, which in this case are presumed to flow from

[5]The Supreme Court held in *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, 349 [41 L.Ed.2d 789, 810], an action for defamation, that "the States may not permit recovery of presumed or punitive damages, *at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.*" (Italics added.) The instant case is distinguishable from *Gertz.* Initially, the interests protected by a suit for malicious prosecution include misuse of the judicial system itself; a party should not be able to claim First Amendment protection maliciously to prosecute another person. Secondly, the jury in the instant case must have found "knowledge of falsity or reckless disregard for the truth" in order to award punitive damages herein. Therefore, even under *Gertz,* a finding of presumed damages is not unconstitutional.

the defendant's conduct without any proof of such harm or loss: damage to reputation, humiliation and emotional distress.

"No definite standard or method of calculation is prescribed by law to fix reasonable compensation for these presumed elements of damage. Nor is the opinion of any witness required as to the amount of such reasonable compensation. Furthermore, the argument of counsel as to the amount of damages is not evidence of reasonable compensation. In making an award for damage to reputation, humiliation and emotional distress, you shall exercise your authority with calm and reasonable judgment, and the damages you find shall be just and reasonable."

The following instruction was requested by defendant and was rejected by the trial court: "The amount of compensatory damages should compensate plaintiff for actual injury suffered. The law will not put the plaintiff in a better position than he would be in had the wrong not been done." Accompanying the request for that motion is a citation to *Staub* v. *Muller,* 7 Cal.2d 221 [60 P.2d 283], and *Basin Oil Co.* v. *Baash-Ross Tool Co.,* 125 Cal.App.2d 578 [271 P.2d 122].

The Supreme Court has recognized that "Damages potentially recoverable in a malicious prosecution action are substantial. They include out-of-pocket expenditures, such as attorney's and other legal fees . . .; business losses . . .; general harm to reputation, social standing and credit . . .; mental and bodily harm . . .; and exemplary damages where malice is shown . . . ." (*Babb* v. *Superior Court,* 3 Cal.3d 841, 848, fn. 4 [92 Cal.Rptr. 179, 479 P.2d 379].) While these damages are compensable, it is the determination of the damages by the jury with which we are concerned. Appellant seems to contend that the jury must have actual evidence of the damages suffered and the monetary amount thereof.

" 'The determination of the jury on the issue of damages is conclusive on appeal unless the amount thereof is so grossly excessive that it can be reasonably imputed solely to passion or prejudice in the jury. [Citations.]' " (*Douglas* v. *Janis, supra,* 43 Cal.App.3d at p. 940.) The presumed damage to respondent's reputation from an unfounded charge of theft, along with imprisonment for 21 days, and the mental and emotional anguish that must have followed are such that we cannot say that the jury's finding of $50,000 in compensatory damages is unjustified.

That amount does not alone demonstrate that it was the result of passion and prejudice.

### 8. *Respondent is entitled to punitive damages.*

 Appellant cites the general rule that although an employer may be held liable for an employee's tort under the doctrine of respondeat superior, ordinarily he cannot be made to pay punitive damages where he neither authorized nor ratified the act. (4 Witkin, Summary of Cal. Law. (8th ed.) § 855, p. 3147.)[6] Appellant claims that the Church of Scientology, which is the corporate defendant herein, never either authorized or ratified the malicious prosecution.

The finding of authorization may be based on many grounds in the instant case. For example, the fair game policy itself was initiated by L. Ron Hubbard, the founder and chief official in the church. (Exhibit 1.) It was an official authorization to treat "enemies" in the manner in which respondent herein was treated by the Church of Scientology.

Furthermore, all the officials of the church to whom respondent relayed his desire to leave were important managerial employees of the corporation. (See 4 Witkin, Summary of Cal. Law (8th ed.) *supra*, § 857, p. 3148.)

The trier of fact certainly could have found authorization by the corporation of the act involved herein.

### 9. *The award of punitive damages.*

 Any party whose tenets include lying and cheating in order to attack its "enemies" deserves the results of the risk which such conduct entails. On the other hand, this conduct may have so enraged the jury that the award of punitive damages may have been more the result of

---

[6]We again note that *Gertz* v. *Robert Welch, Inc., supra,* precludes the award of punitive damages in defamation actions "at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." The facts of the instant case fall within that categorization, so a finding of punitive damages was proper. Moreover, as we noted above, an egregious case of malicious prosecution subjects the judicial system itself to abuse, thereby interfering with the constitutional rights of all litigants. Punitive damages may therefore be more easily justified in cases of malicious prosecution than in cases of defamation. The societal interests competing with First Amendment considerations are more compelling in the former case.

feelings of animosity, rather than a dispassionate determination of an amount necessary to assess defendant in order to deter it from similar conduct in the future. In our view the disparity between the compensatory damages ($50,000) and the punitive damages ($250,000) suggests that animosity was the deciding factor. Our reading of the decisional authority compels us to conclude that we should reduce the punitive damages. We find $50,000 to be a reasonable amount to which the punitive damages should be reduced. We perceive this duty, and have so modified the punitive damages award not with any belief that a reviewing court more ably may perform it.[7] Simply stated the decisional authority seems to indicate that the reviewing court should examine punitive damages and where necessary modify the amount in order to do justice. (*Cunningham* v. *Simpson,* 1 Cal.3d 301 [81 Cal.Rptr. 855, 461 P.2d 39]; *Forte* v. *Nolfi,* 25 Cal.App.3d 656 [102 Cal.Rptr. 455]; *Shroeder* v. *Auto Driveaway Company,* 11 Cal.3d 908 [114 Cal.Rptr. 622, 523 P.2d 662]; *Livesey* v. *Stock,* 208 Cal. 315, 322 [281 P. 70].)

10. *Instruction on probable cause.*

Appellant requested an instruction stating: "Where it is proven that a judge has had a preliminary hearing and determined that the facts and evidence show probable cause to believe the plaintiff guilty of the offense charged therefore, ordering the plaintiff to answer a criminal complaint, this is *prima facie* evidence of the existence of probable cause." The trial court gave the following instruction: "The fact that plaintiff was held to answer the charge of grand theft after a preliminary hearing is evidence tending to show that the initiator of the charge had probable cause. This fact is to be considered by you along with all the other evidence tending to show probable cause or the lack thereof."[8]

Appellant claimed for the first time in its reply brief that the trial court's lack of proper instruction regarding probable cause was prejudicial error. Since this issue was raised for the first time in appellant's reply brief, we decline to review the issue.[9]

---

[7]See dissent in *Cunningham* v. *Simpson,* 1 Cal.3d 301 [81 Cal.Rptr. 855, 461 P.2d 39].

[8]This instruction was given on the court's own motion.

[9]We note that given the circumstances of the instant case, the juror could have easily been misled by the requested instruction. If the evidence showed that the agents and employees of appellant were lying, then the preliminary hearing at which they also testified would not be valid. While the jurors may of course consider that the magistrate at the preliminary hearing found probable cause, that should be in no way conclusive in the jury's determination of probable cause.

The judgment is modified by reducing the award of punitive damages only, from $250,000 to the sum of $50,000. As modified the judgment is in all other respects affirmed.

Costs on appeal are awarded to respondent Allard.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied June 17, 1976, and the petitions of both parties for a hearing by the Supreme Court were denied July 15, 1976.