Earl C. CATES, Sr., Appellant (Defendant),

v.

Bruce N. EDDY, Appellee (Plaintiff).

No. 83–9.

Supreme Court of Wyoming.

Sept. 16, 1983.

Rehearing Denied Oct. 12, 1983.

Walter C. Urbigkit, Jr. (argued) and Carole Shotwell of Urbigkit & Whitehead, P.C., Cheyenne, for appellant.

Dallas J. Laird, Casper, for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

CARDINE, Justice.

This was a malicious prosecution action resulting from the arrest of plaintiff, Bruce Eddy (appellee), upon a criminal complaint and warrant issued because of alleged conduct of defendant, Earl Cates (appellant). Appeal is from the judgment in that action awarding both compensatory and punitive damages.

We affirm the reduced judgment if remittitur is accepted; or, if it is not, we remand for a new trial on the issue of damages.

The issues upon appeal, as stated by appellant, are:

"A. Did the Trial Court err in allowing the jury to return a verdict with excessive damages?

"B. Were the damages sufficiently proved in the Trial Court?

"C. Were the instructions on damages sufficient?

"D. Did the Trial Court err in denying a continuance when it was apparent prior counsel had totally failed to meet even a modicum of responsibility to prepare for trial?

"E. Did the Trial Court err on the instructions it gave on the issue of malicious prosecution, damages and burden of proof?

"F. Did Appellee as Plaintiff below properly plead and prove a cause of action for malicious prosecution?"

The issues are stated in six paragraphs. We have combined paragraphs B and C and revised the order in which the issues are presented. Thus, the issues for consideration are:

1. Should the court have granted a continuance?

2. Were instructions sufficient as to burden of proof?

3. Were the elements of a malicious prosecution action correctly stated; were they proven?

4. Were the damages sufficiently proven, under proper instructions?

5. Were the damages excessive?

FACTS

Prior to 1979, appellant and appellee became partners in the development and subdivision of lands and other business ven-

tures. In 1979, they formed JEB Corporation to own and operate a farming operation on two parcels of land near Riverton, Wyoming. Appellee, Bruce Eddy, was president and manager of JEB. He divided his time between his dental practice in Casper, Wyoming and the farm near Riverton, devoting three to four days a week to the farming operation. An accountant in Lander was employed by JEB to keep the books and records of the corporation. Occasionally appellee signed checks in blank which he left with the accountant to be used for paying bills.

The farming operation did not fare well. Large numbers of livestock were lost due to weather or for other reasons, supplies and equipment were confiscated or turned up missing, the corporation was heavily in debt, and during June or July of 1980, appellant took over the operation. The JEB checkbook and books and records of the corporation were delivered to appellant by the accountant.

By this time, the business relationship between appellant and appellee had deteriorated significantly, and they had become involved in serious disputes over their affairs.

There was outstanding a bill owed to Farmers Exchange at Riverton for agricultural supplies and equipment sold upon open account to JEB Corporation. On August 21, 1980, Farmers Exchange sent a statement of this account in the amount of $9,669.83 to appellant requesting payment. By letter, dated August 25, 1980, appellant advised Farmers Exchange that the statement should be submitted to Dr. Bruce Eddy (appellee) or James Willey (also a stockholder in JEB Corporation but not involved in this matter).

On August 30, 1980, Farmers Exchange sent a second statement of this account to appellant with a service charge added showing a total balance due of $9,814.17. This statement was neither sent nor communicated to appellee.

On September 4, 1980, appellant, by letter, advised Farmers Exchange to submit the statement to Bruce N. Eddy, JEB Ranch Company, for payment. On the same date, September 4, 1980, a JEB Ranch Company typewritten check over appellee's signature as maker in the amount of $9,814.17 was mailed to Farmers Exchange. The JEB Ranch Company checking account had been closed for some time before September 4, 1980. The check was deposited, marked by the bank, "Account Closed" and returned to Farmers Exchange.

Farmers Exchange contacted appellee about the check. Appellee stated that he was unaware of it, that he would work it out, and requested that they send him a copy. After receiving a copy of the check, appellee called Farmers Exchange advising that he thought the signature was his, that he did not believe he had sent the check, and that he would try to work something out. On October 16, 1980, appellee, by letter to Farmers Exchange, advised that he did not make out the check, but wanted to resolve the problems of JEB Ranch and requested that prosecution be withheld. Appellee did nothing thereafter. On January 9, 1981, a complaint and warrant was issued that resulted in appellee's arrest on the same date.

Appellee was arrested at his home in Casper, Wyoming, taken outside, and forced to stand spread-eagled over the hood of his car, where, in view of his neighbors, he was searched, handcuffed, placed in the police car, and driven to jail. He was arrested at 4:38 p.m. and released from jail at 5:20 p.m. the same day upon his oral recognizance to appear in court on January 18, 1981. On February 17, 1981, the charge was dismissed.

Appellee was embarrassed, humiliated, depressed, concerned over the effect on his children and family of his arrest, unable to concentrate in his work, rescheduled appointments with patients, and concerned that the conviction of a felony might result in the loss of his dental license. He was seen by a psychiatrist and a psychologist who testified to the mental suffering and problems caused by his arrest. He incurred attorneys' fees in the amount of $5,000, although he testified that only part of that

related to the arrest and the balance concerned other lawsuits in which he was involved and other matters. He claimed special damages of $450 for psychiatric fees, $165 for psychological consultation, $200 in investigative fees (he submitted to a lie detector test which was a factor in the charges against him being dismissed), and $5,000 attorneys' fees.

Appellee had previously written insufficient funds checks on the JEB Ranch Company account, had previously been arrested and put in jail for several hours on a driving-while-under-the-influence charge, going through about the same book-in and release procedure. At the time, appellee was involved in twelve lawsuits, six of which he specifically remembered. There was also an ongoing grand jury investigation concerning machinery which the FBI had seized from the JEB Ranch Company at Riverton. This evidence was introduced by appellant as a factor involved in appellee's inability to function in his work and his emotional distress.

After being released from jail, appellee telephoned appellant about the check. He testified that appellant told him that he had made out and sent the check to Farmers Exchange. Appellee's wife, Sue Eddy, testified to another telephone conversation she overheard in which appellant stated he would "get Bruce [appellee] arrested." Sue Eddy also testified that she was on a telephone extension when appellee called appellant after his arrest and that appellant, when asked if he had had appellee arrested, answered "yes."

A business associate of both parties, Marvin Klassen, testified that in November 1980 appellant, in a conversation, advised him that he had appellee on a bum check charge and was going to put him in jail. Appellant denied completing the check, denied sending it to Farmers Exchange, and denied the telephone conversations with appellee. Appellant admitted advising Marvin Klassen in November of 1980 that appellee was going to jail, but stated that conversation concerned the grand jury investigation in federal court over the confiscated equipment from the farm in Riverton.

The jury found that appellant had intentionally, willfully, and maliciously, knowing the account was closed, obtained a check signed in blank by appellee, and had completed and mailed that check to Farmers Exchange for the purpose of procuring the arrest of appellee. A verdict was returned awarding appellee $100,000 compensatory damages.

The trial was bifurcated, and the question of punitive damages was presented separately to the same jury the following day. Appellant's net worth was established as being in excess of $1,500,000. The jury returned a verdict awarding exemplary damages to appellee in the amount of $200,-000. Appeal is from this judgment totaling $300,000.

I

*Should the court have granted a continuance?*

This case was commenced by appellee filing his complaint on April 1, 1981. About a year later, on April 30, 1982, pretrial conference was held and the case then was set for trial by jury on October 4, 1982.

On September 22, 1982, appellant's first attorney filed a motion for continuance. On September 29, just five days prior to trial, a motion to withdraw was filed, signed by both appellant and his attorney, stating that appellant "no longer wishes to retain the said [first attorney] * * *." On the same date an order was entered allowing the withdrawal noting, "that the defendant [appellant] has insisted on Counsel withdrawing, as of September 28, 1982." Appellant, then, on September 30, pro se, filed a motion for continuance. Second counsel was retained on the evening of September 30th and he filed, on October 1, 1982, yet another motion for continuance. The motions for continuance were denied at a hearing conducted immediately prior to the commencement of trial.

The trial court has broad discretion in the granting or denying of a motion for

continuance; and, absent a manifest abuse of discretion, the reviewing court will not disturb such ruling. *Craver v. Craver,* Wyo., 601 P.2d 999 (1979); *Holly Sugar Corp. v. Perez,* Wyo., 508 P.2d 595 (1973). To find an abuse of discretion, the refusal must be so arbitrary as to deny appellant due process, and the burden rests upon appellant to prove actual prejudice and a violation of his rights. *Bacon v. Carey Co.,* Wyo., 669 P.2d 533 (1983); *State v. Spurlock,* 161 Mont. 388, 506 P.2d 842 (1973).

On review we look at the peculiar circumstances of the case and the reasons presented to the trial judge at the time of the request. *Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921, reh. denied 377 U.S. 925, 84 S.Ct. 1218, 12 L.Ed.2d 217 (1964).

■ This case had been pending for more than one and one-half years. Depositions were taken; pretrial had been held. Appellant, Cates, by his own admission, was aware of the trial date and his attorney's motion for continuance made approximately two weeks before trial. Only after Cates joined in the motion and insisted upon his first attorney's withdrawal, did the court allow the withdrawal. One day later, Cates employed his second attorney. This attorney again moved for a continuance which the court denied.

■ Withdrawal of an attorney or his discharge in a civil case does not give a party an absolute right to a continuance. *Grunewald v. Missouri Pacific Railroad Co.,* 331 F.2d 983 (8th Cir.1964). Even though the denial of the continuance may have seriously inconvenienced appellant, the situation was due to his own making and that is a factor to be considered.

Many jurisdictions weigh the appellant's right to counsel against the prompt admin-

istration of justice. Annot., 73 A.L.R.3d 725. The trial court is better able to judge the matter, is more conversant with local conditions, status of the docket, and the capacity and disposition of counsel. It is more familiar with the background and general setting of the situation, which is frequently not embalmed in the formal record. Absent a clear abuse of judicial discretion, this court will not interfere. *State v. Hathaway,* 224 Iowa 478, 276 N.W. 207 (1937); See, *Randolph v. Hays,* Wyo., 665 P.2d 500 (1983). We do not find an abuse of discretion in this case.

## II

*Were instructions sufficient as to burden of proof?*

■ Appellant objected to Instruction No. 4[1] upon the grounds that it failed to inform the jury that appellee had the burden of proving each of the elements listed. The objection has merit. Better practice is that the jury be informed in a separate-issues instruction of the elements which make up plaintiff's claim, the defenses asserted, and the burden of proof as to each of these claims and defenses. Instruction No. 4 required that the elements be proven by a preponderance of the evidence. It was followed by Instruction No. 5 which described the burden of proof and defined preponderance of evidence. This instruction provided that the party carrying the affirmative of an issue had the burden of proof as to that issue. Although the instructions in this case could have more clearly set forth the burden of proof of the respective parties as to the issues involved, there is no showing that prejudice resulted. *Rissler & McMurry Co. v. Atlantic Richfield Co.,* Wyo., 559 P.2d 25 (1977). Considering instructions numbered 4 and 5 together, and

---

1. Instruction No. 4 provided:

"YOU ARE INSTRUCTED that in order to return a verdict for damages in an action for malicious prosecution, each of the following elements must be established by a preponderance of the evidence:

"(1) That the Defendant initiated, caused or procured the arrest or prosecution of the Plaintiff;

"(2) That the criminal proceeding against the Plaintiff terminated in his favor;

"(3) That the Defendant acted without probable cause in initiating or procuring the arrest or prosecution of the Plaintiff;

"(4) That the Defendant acted with malice; and

"(5) That the Plaintiff suffered injury or damage."

taking the instructions as a whole, the fact that plaintiff carried the burden of proof as to the elements described in Instruction No. 4 was reasonably conveyed to the jury. A party is not prejudiced by a particular instruction when the matter complained of is covered in other instructions or by taking the instructions as a whole. *Berta v. Ford,* Wyo., 469 P.2d 12 (1970).

### III

*Were the elements of a malicious prosecution action correctly stated; were they proven?*

In *Consumers Filling Station Co. v. Durante,* 79 Wyo. 237, 333 P.2d 691 (1958), we set forth the elements necessary to an action for malicious prosecution as follows:

"(1) The institution or continuation of original judicial proceedings, either criminal or civil;

"(2) Such proceedings having been by or at the instance of the defendant * * *;

"(3) The termination of such proceedings in favor of the plaintiff * * *;

"(4) Malice in instituting the proceedings;

"(5) Want of probable cause; and

"(6) The suffering of injury or damage as a result of the action complained of." 333 P.2d at 694.

No issues were raised on appeal concerning the existence of the elements specified for malicious prosecution in paragraphs three through six above. The jury found in favor of appellee with respect to each of these elements; that finding is amply supported by the record and not contested in this appeal.

Thus, left for consideration are the provisions of paragraphs one and two which require,

"the institution * * * of original judicial proceedings * * * *by or at the instance of the defendant* * * *." (Emphasis added.)

Appellant's position is that he did not sign the check; he did not sign an affidavit nor a complaint which caused the arrest warrant to issue; the proceedings were instituted by the payee of the check; and the prosecuting attorney of Fremont county made the decision to obtain the issuance of an arrest warrant and to prosecute. The essence of his defense is that the criminal proceeding was not instituted by him or at his instance, that, at most, he was passive or acquiesced in the proceedings, and that, therefore, appellee's action must fail.

Applying the requirement "at the instance of" literally to this case might result in appellee being denied recovery and, as hereafter demonstrated, that would be wrong. Construing "at the instance of" to include a third person who surreptitiously furnishes information to one who then passes the information to the prosecuting attorney would be a strained construction, confusing to a jury, and one we are reluctant to accept.

Appellant offered an instruction in the language of *Consumers Fillings Station Co. v. Durante,* supra, requiring "[t]he institution * * * of original judicial proceedings * * * [b]y, or at the instance of the defendant." The instruction was refused. Instead the jury was instructed that the criminal proceeding must have been, "initiated, caused or *procured*" by the defendant. (Emphasis added.) Appellant claims this was a departure from our pronouncements in *Consumers Filling Station Co. v. Durante,* supra, and error.

The instruction given goes beyond *Consumers Filling Station v. Durante,* supra, enlarging the areas in which recovery is allowed for malicious prosecution. The reasons for the rule must be considered in deciding whether it should be adopted. Two competing policies are recognized in considering malicious prosecution actions. Both are beneficial and necessary to an orderly society.

On the one hand, it is stated that malicious prosecution actions are not favored in the law because of a public policy in favor of uncovering and prosecuting crime. Large tort judgments against well-meaning individuals, acting honestly and in good faith, might seriously inhibit those attempting to perform what they believe a civic

duty. A policy that discourages citizens from reporting crime or aiding in prosecution would be undesirable and detrimental to society in general.

On the other hand, it is generally accepted that for every wrong there should be a right. That also is necessary to an orderly society, for the alternative is that the party wronged seek his own redress. Experience has shown that remedy to be unacceptable. Thus, one who is subjected to unjustifiable criminal or civil proceedings because of spite or malice, which result in damage and injury, should recover compensation for that loss.

The competing policy considerations are nicely balanced; and requiring malice and lack of probable cause as necessary elements to an action for malicious prosecution affords adequate protection to the first policy and restriction upon the second. Allowing a malicious prosecution action where the proceeding was "initiated, caused or procured" by the defendant is fair. It will not be destructive of either of the stated policies.

Appellant focuses upon the word "procure." He asserts that the court's instruction on causation, which states that one "initiating, causing or *procuring* the arrest or prosecution of criminal proceedings against another" is in error as to the causation requirement because of the presence of the word "procuring." While the specific articulation "procuring," "procured," "procurement," has not often appeared in Wyoming formulations of the tort to date,[2] it is in common usage in defining the causation element of malicious prosecution, and adds no new element to the tort. It was used by this court in *McIntosh v. Wales,* 21 Wyo. 397, 134 P. 274 (1913), when the court stated,

"* * * [t]his court has repeatedly held that it could not protect a complainant * * * after *procuring* a warrant to issue on his complaint * * *." (Emphasis added.) 134 P. at 276.

2. See, e.g., *Penton v. Canning,* 57 Wyo. 390, 118 P.2d 1002 (1941); *Henning v. Miller,* 44 Wyo. 114, 14 P.2d 437 (1932); *McIntosh v.*

Procuring is a common word, easily applied and understood. In fact, the presence of an additional articulation of the causation element may assist the fact finder in getting a better grip on this concept within the total cause of action. But quibbling over the presence or absence of "procuring" in the definition of the causation element of the tort ought not confuse the real debate here, viz, was causation present so as to render appellant liable.

Appellant here contends that he signed no affidavit, had no contact with the prosecuting attorney nor the complaining witness, that four months expired between the issuance of the check and the arrest warrant, and that it was the prosecuting attorney who made the decision to issue the warrant; that whatever he did, it was not a *proximate cause* of appellee's harm. Although the question is not unique, the cases which have considered it upon similar facts are few.

In *Hryciuk v. Robinson,* 213 Or. 542, 326 P.2d 424 (1958), defendant gave plaintiff permission to remove rock from his son's property. Thereafter a dispute arose between defendant and plaintiff and defendant said, I will "fix you." The son discovered the rock missing. Defendant advised his son that plaintiff had taken the rock. The son advised the police of this, and plaintiff was arrested. Plaintiff then filed an action for malicious prosecution.

The Oregon Supreme Court stated,

"The test of liability in an action for malicious prosecution is: was defendant actively instrumental in putting the law in force? To sustain the action, it must affirmatively appear as part of the case of the party demanding damages that the party sought to be charged was the *proximate and efficient cause* of maliciously putting the law in motion. * * * *" (Emphasis added.) *Meyer v. Nedry,* 159 Or. 62, 78 P.2d 339, 341 (1938).

*Wales,* 21 Wyo. 397, 134 P. 274 (1913); *Boyer v. Bugher,* 19 Wyo. 463, 120 P. 171 (1912).

*Motley v. Dugan,* Mo.App., 191 S.W.2d 979 (1945), was a case in which a twelve-year-old girl took money; gave it to a twelve-year-old boy; who gave it to Streible, his father, who was arrested at Medley's home. Plaintiff, the arresting officer, later went back and obtained the money as evidence in the case. Defendants, two deputies, induced Medley to make an affidavit charging plaintiff with extortion. Plaintiff was arrested and thereafter instituted an action for malicious prosecution. The court stated,

> " * * * appellants contend that there was no evidence that appellants were the *procuring* cause of the prosecution.
>
> "We cannot agree with this contention. There was ample evidence to show that appellants were the procuring cause of the arrest * * *." (Emphasis added.) 191 S.W.2d at 982.

The court further noted that, "[i]t is sufficient to show that he was the proximate and efficient cause of maliciously putting the law in motion."

In *White v. Chicago, Burlington and Quincy Railroad,* 417 F.2d 941 (8th Cir. 1969), a railroad investigator gave false information to the prosecuting attorney concerning an incident involving a railroad employee and a third person. The prosecuting attorney issued a warrant which resulted in the arrest of the railroad employee and an action for malicious prosecution against the railroad ensued.

The court, after stating the general rule that a person who supplies information to prosecuting authorities is not liable as long as the ensuing prosecution is left to the official's discretion, noted that the rule was not without limitations, and stated,

> " * * * Where the informant knowingly gives false or misleading information or in any wise directs or counsels officials in

such a way so as to actively persuade and induce the officer's decision, then the informant may still be held liable. * * * " 417 F.2d at 943.

Then quoting from an Iowa case, the court said:

> "[I]t is apparent that the defendant set the machinery of the law in motion; at least, the jury was authorized to so find. It need not be shown that the defendant ordered or directed the warrant or process to issue, or that he participated in its execution. If he, on his own motion, gave information or made complaint to the officers of the law in such a manner as that, in the regular and ordinary course of events, an arrest must be made, or will probably follow, this is sufficient to warrant the jury in finding him the real prosecutor. * * * "

■ In this case appellant contends that the acts were too remote in time (four months) and distant (no connection with prosecuting authorities) to be a proximate cause of appellee's arrest and damage. Proximate causation has universally been conceded to be, not a matter of metaphysical precision, but rather of policy and fairness.[3] Considering the nature of appellant's acts and the virulent malice motivating them as revealed at the trial below[4] this court has no difficulty in finding the scales balancing toward a finding of causation. Appellant set the law in motion by corruptly, deceitfully, and dishonestly manufacturing evidence of a crime, delivering that evidence to another, knowing that it might be given to law enforcement authorities and result in appellee's arrest. These acts were not passive, mere acquiescence, nor did they result from negligence. The acts were intentional, deliberate and malicious. The jury, under the court's instruc-

---

**3.** Cf. Prosser, Law of Torts (4th ed. 1971), p. 237:
"This limitation [on defendant's legal liability] is sometimes, although rather infrequently, one of the fact of causation. More often it is purely one of policy, of our more or less inadequately expressed ideas of what justice demands, or of administrative possibility and

convenience, none of which have any connection with questions of causation at all. * * * "

**4.** Witnesses testified that appellant stated he had a check he would use to put appellee in jail and that his partner would have to bring him cigarettes in jail.

tions, which we approve, found them to be the *cause* of appellee's arrest. There was ample evidence to support that finding.

## IV

*Were the damages sufficiently proven, under proper instructions?*

Appellant contends that Instruction No. 11 is insufficient in two respects: First, that it did not require a causal connection between the plaintiff's actual injury and the award of damages; and second, that it failed to instruct the jury that defendant's net worth should not be considered in its award of damages.

■ Jury Instruction No. 10 provides that,

" * * * a Plaintiff who has suffered harm as a proximate result of a malicious prosection [sic] by a Defendant is entitled to recover damages for such harm * * *."

Jury Instruction No. 11 states in part, " * * * You should allow him such amount of money as will reasonably compensate him for the damage resulting from the wrongful conduct of the defendant. * * * "

These instructions, taken together, plainly state that the damage awarded must "result from," or be "proximately" caused by the injury. The damage instructions given by the court were sufficient and did not contain prejudicial error.

■ With respect to appellant's second contention, no evidence of defendant's financial status was received until after the jury had returned a verdict finding for the plaintiff and awarding compensatory damages. Thus, it was unnecessary to instruct concerning defendant's net worth during the first phase of the trial.

■ Appellant also claims that Instruction No. 1(A) was insufficient. However, appellant did not object to the giving of this instruction nor offer a different instruction. Therefore, appellant has waived his right to object on appeal. Rule 51, W.R.C.P. provides,

" * * * No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. * * * "

See also, *Sanders v. Pitner*, Wyo., 508 P.2d 602 (1973); *Texas Gulf Sulphur Co. v. Robles*, Wyo., 511 P.2d 963 (1973).

## V

*Were the damages awarded excessive?*

The jury returned its verdict in the liability phase of the trial awarding appellee $100,000 compensatory damages. The jury then was instructed by the court upon punitive damages, retired again to deliberate, and returned a punitive damage award in the amount of $200,000.

Because of our deep and abiding faith in the jury system and knowledge that juries, even in the most complicated cases, generally achieve good results, we have an extreme reluctance to modify jury verdicts. Yet we are aware that no system is perfect and on occasion a jury will reach what is obviously an incorrect result in the eyes of all reasonable persons. Thus, the jury is not free to award any sum it might choose, however large or small, whether from anger, sorrow, prejudice, mistake, or other improper cause. Although considerable latitude is afforded the jury in arriving at its verdict in these kinds of actions, yet that verdict must fall within a range, however large, that is acceptable.[5]

■ There is no precise formula for determining what damages ought to be awarded in a malicious prosecution action. We can look to other decided cases for guidance, but that is not determinative of the question, for each case presents its own peculiar facts and circumstances which must be evaluated. When the verdict of the jury, at first blush, appears outrageous, grossly excessive, or to be the result of passion, prejudice, mistake, or improper motive, so as to be obviously disproportionate

5. 35 A.L.R.2d 308.

to the injury shown, then it is the duty of the court to modify the verdict. *Hall Oil Co. v. Barquin,* 33 Wyo. 92, 237 P. 255 (1925); 52 Am.Jur.2d 251; Rule 59, W.R. C.P.

## COMPENSATORY DAMAGES

Compensatory damages in a malicious prosecution action consist of special and general damages and are awarded for the personal loss and injury of the malicious prosecution plaintiff. Special damages include expenses actually incurred for attorneys' fees, bonds, court expenses, loss of business or income, and for medical care and treatment if appropriate. In this case, appellant agreed in its brief and argument that appellee's special damages were in the amount of $5,815. This not being an issue in the case, we need not consider the matter further and accept that amount as correct.

General damages are those awarded for mental and physical suffering, humiliation, embarrassment, shame, public disgrace, and harm to reputation and social standing. *Town of Jackson v. Shaw,* Wyo., 569 P.2d 1246 (1977).

Considering the humiliation and embarrassment to respondent of being arrested at his residence, observed by his neighbors spread-eagled against his car and searched, taken by police to the station where he was photographed and booked in, having felony charges pending against him for approximately one and one-half months, and the mental and emotional anguish that he suffered because of the effect upon his children and family and upon himself and his profession, the award of compensatory damages in the amount of $100,000 is not excessive.

## PUNITIVE DAMAGES

Punitive damages are awarded not as compensation for injury and loss suffered by the plaintiff, but rather as punishment of the defendant and deterrence of future similar conduct by others. Ordinarily punishment is meted out by the courts with fines being paid to the public treasury. In malicious prosecution actions, the plaintiff benefits from the award and it is sometimes called "smart money." In *Town of Jackson v. Shaw,* supra, we stated that although punitive damages are not a favorite of the law and are to be allowed only with caution within narrow limits, that

> "This court has traditionally accepted the doctrine of punitive damages but always with some reservation of the right to examine them closely and reduce them by accepted methods, if necessary. \* \* \*" 569 P.2d at 1252.

Factors to be considered in arriving at the punitive damage award are:

> (a) the financial condition or wealth of the defendant;
>
> (b) the activity of the defendant causing the harm; and
>
> (c) the nature and extent of the injury suffered.

As we said in *Hall Oil Co. v. Barquin,* supra, financial wealth is not the sole criteria and it alone will not support a large award of damages where the injury does not support that award.

In this case the "Account Closed" check had been outstanding for four months. Appellee was aware of the check and had suggested to the payee that he would "try to work something out." He was released forty-two minutes after he was arrested upon his oral recognizance. One and one-half months later the charges were dismissed without his ever appearing in court. On a previous occasion he had been through the same arrest, book-in and release procedure.

The activities of appellant are such as to justify an award of punitive damages. The testimony of the parties was in total conflict concerning the issuance of the check, the telephone conversations between them, and the claimed admissions of culpability. The jury was in a position of having to accept the testimony of one party and reject the testimony of the other. In this circumstance they might act out of passion or emotion, rather than, as stated in a *Allard v. Church of Scientology of California,*

58 Cal.App.3d 439, 129 Cal.Rptr. 797 (1976), arriving at

" * * * a dispassionate determination of an amount necessary to assess defendant in order to deter * * * similar conduct in the future. * * * " 129 Cal.Rptr. at 805.

In that case the court reduced a punitive damage award from $250,000 to $50,000 stating,

" * * * the decisional authority seems to indicate that the reviewing court should examine punitive damages and where necessary modify the amount in order to do justice. * * * " 129 Cal.Rptr. at 805–806.

Ordinarily a jury is involved with just one case. It cannot know what other jurors have done in similar cases or the range of verdicts in those cases. The court, on the other hand, sees many cases and, from those and its expertise, has a sense of where the verdict should fall. Examination of compilations of verdicts in cases similar to this case reveals not a single case in which the verdict was as large as this verdict.[6] While this is not determinative of what the verdict should be, it is something we must consider. If the verdict is so large or small that it shocks the judicial conscience, the court has not only the right, but the duty, to grant remittitur or additur accordingly.[7]

We hold, therefore, that the punitive damage award in this case is excessive by $100,000. Appellee may elect to accept a judgment of $200,000 by filing a remittitur of $100,000 with the clerk of the district court within fifteen days after the filing of the mandate of this court, or upon failure to file such remittitur, the judgment is reversed and the cause remanded for a new trial on the issue of damages.

We feel that the issue of whether or not the trial was conducted according to the procedures set out in *Campen v. Stone*, Wyo., 635 P.2d 1121 (1981), needs to be discussed, not only because of the possibility that appellee might choose a new trial rath-

er than remittitur but also because of the likelihood that this problem will occur again. Ordinarily the supreme court refrains from addressing issues not raised by the parties, however, in this situation, we feel a need to clarify the rules set out in Campen. We do not feel this issue is dispositive because it was not objected to at trial, it was not raised on appeal, nor was it argued before the court.

*Campen,* supra at 1132, sets out the procedure for a bifurcated trial when punitive damages are at issue.

"1. The plaintiff may claim in his complaint a right to punitive damages and then seek pretrial discovery of a defendant's wealth.

"2. Defendant may move for a protective order requiring the plaintiff to make a prima facie showing to the trial court that a viable issue exists for punitive damages. Upon such a showing, the pretrial discovery would be allowed.

"3. At trial, if evidence is produced making a prima facie case of punitive damages, the verdict form will make provision for compensatory damages and *further ask the jury whether punitive damages should or should not be awarded.* However, no provision would be made for the jury to determine the amount of punitive damages to be awarded at that point.

"4. If the jury finds that punitive damages should be awarded, it then hears evidence of the defendant's financial status and returns a separate verdict setting the award of punitive damages." (Emphasis added.)

The first verdict form should ask the jury whether punitive damages should or should not be awarded. If the jury decides that they should, then a second trial presents evidence of a defendant's financial worth.

In the present situation, the first verdict form made no provision for a finding of punitive damages. In future proceedings

---

6. 66 A.L.R.3d 10.

7. Rule 59, W.R.C.P., provides, " * * * a new trial may be granted for * * * Error in the assessment of the amount of recovery, whether too large or too small."

the verdict form should indicate this provision. This would alleviate any possibility that the jury would include a monetary amount for punishment within the compensatory damage award.

For the reasons stated above, in the event appellee refuses to accept the remittitur, the new trial shall be upon the issue of damages only, both compensatory and punitive. If the remittitur is accepted by appellee, the judgment, as reduced, is affirmed.

ROSE, Justice, concurring in part and dissenting in part, with whom BROWN, Justice, joins.

I concur in the majority opinion except for the punitive-damage remittitur of $100,-000. I think that jury damage verdicts should be permitted to stand. We do not *add* money to low verdicts and we should not *reduce* high verdicts. See my reasoning on this subject in my dissenting opinion in *Town of Jackson v. Shaw,* Wyo., 569 P.2d 1246, 1258–1259 (1977).