Kyong Ju BARNETT, et al.,
Respondent–Appellant,

James S. Barnett, Sr., and Wanda
Barnett, Respondents–
Appellants,

v.

LA SOCIETE ANONYME TURBOMECA
FRANCE a/k/a Turbomeca, S.A.,
Appellant–Respondent,

Turbomeca Engine Coporation,
Appellant–Respondent.

Nos. WD 51980, WD 52016.

Missouri Court of Appeals,
Western District.

Nov. 25, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 27, 1998.

Application for Transfer Denied
March 24, 1998.

See also, —— S.W.2d. ——, 1997 WL
727544.

Gary C. Robb, Kansas City, for Kyong Ju Barnett, et al.

Duke W. Ponick, Jr., Kansas City, for Wanda and James Barnett.

Douglas N. Ghertner, Kansas City, for La Societe Anonyme Turbomeca France.

Thomas C. Walsh, St. Louis, for Torbomeca Engine Corp.

Before ULRICH, C.J., and LOWENSTEIN, BRECKENRIDGE, HANNA, SPINDEN, SMART, ELLIS, LAURA DENVIR STITH, EDWIN H. SMITH and HOWARD, JJ., and BERREY, Senior Judge.

LOWENSTEIN, Judge.

This case, brought by survivors of the pilot in the same Life Flight helicopter accident which underlies the companion opinion handed down this day in *Letz v. Turbomeca Engine Corporation, et al.,* No. WD 51446, —— S.W.2d ——, 1997 WL 727544 (Mo.App.W.D. 1997)., was tried after the *Letz* case. The defendants have appealed on numerous grounds—the plaintiffs cross-appeal on one point. The case was submitted to the jury on the theories of strict liability, negligence and failure to warn. *Letz* is being handed down simultaneously with this, the *Barnett* case, because the cases contain the same facts, similar and overlapping points and because the amount of punitive damages in the previous case bears on the net amount of this award. This is an appeal by the same defendants in *Letz,* from the jury verdicts of $175 million actual damages and $175 million punitive damages which resulted in a trial court judgment, after remittitur, of $25 million actual and $87.5 million punitive arising from the wrongful death suit brought by the family of the pilot.[1] Therefore, this opinion will only briefly recite the relevant facts of the incident including factual and procedural de-

---

1. There is a cross-appeal by the plaintiffs Barnett which relates to the amounts of the credit to be allowed on this judgment for the punitive damages assessed in *Letz.*

tails specific to this appeal. Additional facts will be included in the points to which they are relevant. This opinion will address only the points raised which are not resolved by this court's opinion in *Letz*.

### GENERAL FACTS

On May 27, 1993, a single engine helicopter piloted by James Barnett, Life Flight 2, was transporting trauma victim, Sherry Ann Letz, from Maryville, Missouri to St. Luke's Hospital in Kansas City. En route, the helicopter engine suddenly failed and within ten to fifteen seconds crashed near Cameron. After the engine failed, Barnett maneuvered the aircraft some seventy feet beyond a stand of sixty foot trees, and crash-landed in a field. Four individuals were aboard the helicopter at the time of the crash: James Barnett, Jr., ("Barnett") the pilot; Sherry Letz, the trauma victim; Sheila Roth, a flight nurse; and Philip Hedrick, a respiratory therapist. Letz and Barnett were killed in the crash and the other two passengers were seriously injured. The crash was attributed to the failure of the TU–76 nozzle guide vane, in fact, Turbomeca finally admitted in their brief: "... there is no question in this case that the engine involved sustained an inflight shutdown as a result of the failure of the TU–76 nozzle vane due to low stress thermal fatigue." [2]

The crash resulted in four separate lawsuits: the flight nurse and the respiratory therapist reached settlement agreements with Turbomeca, S.A., which designed and manufactured the helicopter, and Turbomeca Engine Corporation, a wholly owned subsidiary and distributor of the helicopter (hereinafter, the two defendant companies will be collectively referred to as "Turbomeca" and the American subsidiary, when standing alone, will be referred to as "Turbomeca Engine"). Letz's family filed a wrongful death action, and Barnett's family filed the wrongful death action here appealed. Again, in an effort to simplify the facts, Turbomeca shall mean *both* the defendant companies,

and previous individual verdicts and judgments rendered against each of the two defendants shall be combined into one figure to represent the total judgment against "Turbomeca."

Barnett's immediate surviving family members who joined in the wrongful death action were: his wife of fifteen years, Kyong Ju ("Julia") Barnett; his fourteen-year-old son, Jessie; his twelve-year-old daughter Mia; and his parents, Wanda and James Barnett, Sr.

James Barnett died as a result of a transected thoracic aorta—he bled to death in the helicopter within 3 to 5 minutes after the crash. On the date of his death, Barnett was forty years old and in generally good health. He was an experienced military and civilian pilot having completed Army flight school and helicopter training. He was also certified for commercial flights. Barnett was employed as a full-time Life Flight pilot for eight years prior to the accident and earned a salary of $34,000.00 annually. His life expectancy was an additional thirty-five years. Trial testimony indicated the purely economic damages suffered by Barnett's wife and children was $649,080.00. The amount of those damages is not contested.

Because this case was tried after *Letz*, the procedural aspects of the case are distinct. Specifically, the *Letz* trial was not bifurcated and the verdict on damages (originally $70 million) was rendered in one lump sum which did not distinguish the amounts attributable to actual damages and punitive damages. This case was bifurcated as outlined in § 510.263, RSMo 1994,[3] to distinguish the actual and punitive damages. A more detailed discussion of the statute is contained in Point 3, *infra*.

After a seventeen day jury trial, the jury returned a verdict of $175 million actual damages and $175 million punitive damages ($350 million total) in favor of Barnett's family. The verdicts were remitted by the trial court

---

2. For specific details explaining the TU–76 nozzle guide vane, the cause of the crash, and the reports generated by this accident, refer to *Letz v. Turbomeca Engine Corporation*, (slip opinion at pages 3–7).

3. All further statutory references are to the 1994 Revised Statutes of Missouri.

to $25 million actual damages and $87.5 million punitive damages ($112.5 million total). The trial court then issued a credit under § 510.263.5 for the amount of punitive damages previously imposed by the trial court in *Letz*. Since the *Letz* verdict was not bifurcated, the court determined one half of the $70 million total judgment was punitive and, accordingly, issued a $35 million credit. The Barnetts accepted the remitted award and the Second Amended and Final Judgment was entered awarding $25 million in actual damages and $52.5 million in punitive damages ($77.5 million total) allocated among the two named defendants.[4] Turbomeca appeals from this judgment and the Barnetts cross-appeal only on the matter of the credit based on the *Letz* punitive judgment.

Among the points raised in this appeal are several that are addressed and answered in this court's opinion in *Letz*[5]. Those points will not be directly dealt with in this opinion. The six points to be dealt with in this opinion are as follows:

1. Evidentiary questions involving: (A) pre-accident defects, and (B) whether Exhibit 111, an airworthiness directive, and Exhibit 177, an in-house letter on Turbomecca Engine letterhead suggesting the service bulletin was inadequate, should not have been admitted in evidence as they were evidence of post-accident subsequent remedial measures.

2. The trial court improperly instructed the jury in that: Instructions # 25 and # 27 did not instruct on proper mental state; Instruction # 5 improperly defined "ordinary care"; and, Instruction # 19 improperly withdrew an issue from the jury's consideration.

3. The trial court erred in refusing to allow the bifurcation process to be explained to the jury, and as a result, the jury was confused and misled.

4. The trial court erred in overruling defendants' objections to plaintiffs' admission of evidence of defendants' gross sales figures to support plaintiffs' claim for aggravating circumstances damages.

5. The trial court erred in denying defendants' motion for a new trial and refusing to enter a further remittitur of compensatory damages because the judgment as remitted, is grossly excessive, unsupported by the evidence, the product of counsel's misconduct and the jurors' bias, passion and prejudice, and bears no relation to damages authorized by § 537.090.

6. The trial court erred in failing to grant a directed verdict (not preserved in *Letz),* and denying defendants' motion for a new trial and refusing to further remit punitive damages because the judgment remains grossly excessive, the product of counsel's misconduct, constitutes an excessive fine under the Eighth Amendment, denies defendants' due process and shocks the conscience of the court. Points 5 and 6 will be treated together as the final point on the Turbomeca appeal.

Finally, this opinion will address the Barnett cross-appeal on the proper net judgment amount for aggravating damages after calculation of the credit due from *Letz.*

## SPECIFIC FACTS

The following is a timeline indicating the number and dates of all crash incidents involving the modified TU–76 and related Service Bulletins and Letters. It is presented to better acquaint the reader with the issues pertinent to this appeal. Legend:

1. The chronology includes only incidents involving the *modified* TU–76 second stage nozzle—the same defective product on the aircraft in this case. The original TU–76 was replaced by the modified TU–76 in the early 1980s, in order to gain a cost savings in production. The original component had not, prior to the modification, been

---

4. The Appendix to this opinion presents a graphic summary of the dollar amounts awarded in the trial court and this court.

5. Both, (1) the relevance of documents sent by Turbomeca to the FAA after the date of the accident, and (2) challenges to admission of deposition testimony of Dennis Nichols, president of Turbomeca Engine, regarding $48 million in cost savings for Turbomeca in not fixing the TU–76, were addressed in *Letz.*

implicated in any cracking problems or in-flight failures.[6] The later developed TU–202 ("Replacement") and TU–197 ("New") nozzles have not been implicated in any aircraft power failures.

2. Entries under "Information" are taken from internal Turbomeca reports or from testimony of its officials.

3. Entries involving this Life Flight helicopter are printed in bold.

| Year | Specific Date | Information |
|------|---------------|-------------|
| 1985 | June–July | Cracking problem discovered in TU–76 following accident, due to in-flight engine stoppage, in Congo. (1374 hours)(hereafter, where a number appears in parenthesis, that number indicates the number of flight hours between overhauls logged on that particular engine. **There were 2482 hours on the Life Flight helicopter in this case).** Turbomeca examines and determines the second stage problem came after cracking. |
| | September | Helicopter engine was returned by the owner to Turbomeca because of cracking found on the TU–76. |
| | October | Cracking incident involving TU–76 (940). |
| 1986 | January | 1985 Congo accident involving a defective TU–76 reported to French DGAC and to French Military. DGAC is the French equivalent of the United States' F.A.A.. This information of a TU–76 problem was not given to the F.A.A., or other owners. |
| | January | Engine failure (1998)<br>Engine failure (682) |
| | April | In-flight failure of engine (1148) in France, landed with some power. Turbomeca engineering report concludes a nozzle redesign is necessary and suggests overhaul of engine. |
| | June | Turbomeca conducts in-house testing of twelve second stage nozzles for cracking. The engineering report (Saviot) sent to the Executive Vice President, Chief of Engineering and ten others within Turbomeca, suggests the need to correct the cracking problem with TU–76, "caused by a low cycle fatigue stress of thermal origin...." Preliminary conclusions point to poor design and poor manufacturing, and state that poor "machining process has been an aggravating factor." Research begins to correct problem. |
| | July | Follow-up to the June engineering report (Saviot) is sent to all high ranking Turbomeca officials, concluding modifications are needed to solve cracking problems which stemmed in part from "poor manufacturing quality of certain parts, and their improper stress level." Two 2nd stage nozzles were used in this test, one from a unit sold in January 1986 to Heli Union which had cracked after (682) hours and was described in the report as "... earliest cracked nozzle we have identified ... " Turbomeca continues to manufacture engines with the modified TU–76 module. |
| | Year-end | In 1986 there were at least sixteen engines returned to Turbomeca because of cracking. Hours ranged from (682) to (2005). |
| 1987 | | Testing for modifications to TU–76 continues. |

---

**6.** This opinion will refer to the defective *modified* TU–76 as simply the TU–76, since the original TU–76 has never been implicated in any in-flight engine failures.

| | | |
|---|---|---|
| | Year-end | In 1987 ten engines were returned to the manufacturer for cracking. Hours between overhaul were from (1156) to (2057). |
| 1988 | | Testing for modifications continues, results yield "Replacement" (TU–202) (metal change) and "New" (TU–197) (change in shape). |
| | May | Turbomeca increases time between overhauls from 2000 to 2500 hours. |
| | Year-end | In 1988, fifteen engines were returned because of cracking, two were from the French police. Hours ranged from (455) to (2745). |
| | 1989 | April Turbomeca examines unit (865) from Germany which was returned because it suffered "seizing of axial compressor," with torn vanes and broken central hub on 2nd stage assembly. Conclusion: "We have registered up to now 3 cases of ruptures. . . ." |
| | June | Engine (1015) failure, resulting in grave injuries to four individuals in Bolivia. Turbomeca exam by engineer Delbert finds rupture in 2nd stage turbine blades with deterioration of central hub and rupture of outer ring. Report sent to top executives. |
| | June | **TU–76 installed in this helicopter during overhaul by Turbomeca Engine.** |
| | October | Engineering Department of Turbomeca (Delbert) seeks approval of New (TU–197) part but a November notation states it is being "blocked by the Turbomeca's Commercial Department." After examining wreckage from the Bolivian crash, Delbert felt there was an urgent need to correct the TU–76. |
| | November | Loss of power in a Phoenix TV station's helicopter caused an in-flight shutdown. The engine (1607) was examined and it was apparent the helicopter had a complete power failure over a busy freeway. Pilot successfully autorotated and landed in a field—no injuries. Crack around 2nd stage of nozzle guide vane central box—Turbomeca initially advises the owner that the warranty will not cover damage. Turbomeca relents and sends station another engine with the same TU–76 module. |
| | December | Engine failure in flight—Hong Kong. |
| 1990 | January | Engineering memo to Commercial Department seeking "very urgent" approval of Replacement (TU–202) part. |
| | February | A helicopter engine (1639.7) suffers momentary deceleration in Oakland, as pilot hovered, prior to landing, after a round-trip flight. The pilot heard a loud, muffled explosion, power failure occurred, the aircraft yawed, pilot set up hovering autorotation, then engine power returned in 2–3 seconds, and the helicopter safely landed. |
| | May | Replacement and New parts completed and tested by Turbomeca. |
| | October | A confidential Turbomeca technical note (Delbert) on cracking nozzles listed three in-flight shutdowns (1015, 865, and 1602), and that twelve helicopters had been returned by owners because of cracking (all had between 500 and 2000 hours). At the time of the report, 427 engines had *not* been modified with the cheaper TU–76—of these engines with the *original* TU–76, none had been returned nor had been subject to an in-flight shut-down. 2105 of the modified variety existed, including those units that were sent back to Turbomeca or |

had shut-down in flight. This report was sent directly to the DGAC, but never supplied, even after the 1993 accident, to the FAA. This report stated the Replacement and New parts "... were developed to remedy this (cracking) problem."

| | | |
|---|---|---|
| | November | Turbomeca receives certification of New and Replacement parts from DGAC. |
| 1991 | January | Engine deceleration occurs in Oakland—no injuries sustained. |
| | February | Replacement and New parts available to the 2,850 world-wide owners with TU–76, but no general recall is announced. Turbomeca never sent a notice to owners of aircraft with the modified TU–76 part that the New or Replacement components were available. French military were offered New and Replacement nozzles. Turbomeca makes a decision to replace TU–76 during the regular overhaul. (See May 1988). |
| | March | First Service Letter sent to Owners who do not have Replacement, discusses checking for "abnormal noise during engine stop" to check. If owner hears a rubbing noise, it "may be due to a rubbing between the internal hub of the 2nd stage turbine nozzle guide vane and the rotating assembly." The owner was told if the rubbing noise has been loud, the part was to be removed. This was the first notice given to non-French owners of a TU–76 problem. It does not include in-flight failures of TU–76 to date, does not mention the cracking problem and does not mention that Replacement (TU–202) was to be installed at Turbomeca's cost. |
| | June | In-flight shutdown in Portugal. Pilot and two passengers injured. (1354). |
| | June | French military gives approval of New and Replacement parts. |
| 1992 | March | DGAC approval of Replacement part. |
| | April | Service bulletin to American owners announcing availability of Replacement and New parts and recommending installation of either Replacement or New parts at time of regular overhaul. The degree of urgency of the Bulletin was listed as "optional." Levels go from most important, "urgent," down to "mandatory," "recommended," and finally, "optional." |
| | November | In-flight shutdown during take-off in Australia. Engine (1455) examined by Turbomeca—indicates the cracks are due to friction and disconnection of TU–76 second stage nozzle guide vane. |
| | December | Second Service Letter, to Owners who do not have New or Replacement parts, similar to March 1991 Letter (listen for noises). |
| 1993 | January | "Guyana" incident—an in-flight engine shutdown (1401), after explosive noise. DGAC approval of New part. |
| | February | Second service bulletin, similar to April 1992. The degree of urgency was "recommended." It stated the change to the Replacement part would take one mechanic two hours to install. |
| | February 15 | Turbomeca inspects aircraft (1966) with 2nd stage nozzle guide vane damage, after in-flight failure preceded by several loud bangs and rapid loss of power (49%). Occurrence takes place on return portion of a round trip in Virginia. No injuries. |

| | |
|---|---|
| February 15 | Customer in Brazil sends helicopter engine (1669) to Turbomeca after in-flight stoppage. |
| April 13 | Third Service Letter. Turbomeca sends "Alert Information" service letter to Owners, "following an engine in-flight shut-down which occurred recently," warning to be aware of rubbing sounds. The word "mandatory" is used for all Owners who do not have the New or Replacement part. This is first reference in any correspondence by Turbomeca to an in-flight shut down. |
| May 22 | Turbomeca Engine finds 2nd stage problem (2011.5) after a pilot in Houston, Texas heard loud bang, no power loss occurred but while landing, the pilot heard a rubbing noise on coastdown. |
| May 26 | Phoenix TV station (see November 1989) helicopter engine (1894.9 hours on the replacement engine equipped with the TU–76) explodes five minutes after takeoff, yaws to right, pilot makes emergency landing with three passengers after a loss of power. Turbomeca Engine attempts to settle, but in letter sent to Turbomeca, says "I have tried to negotiate with this customer based on repairing his damaged engine which prices out at $178,000 for overhauls which I pro-rated to $134,000 based on the time of 1800 hours on the engine. He stated to me he did not want this engine back and wanted an offer on a new engine. I then offerred (sic) him a new 1B engine for $165,000 plus his old engine. He was insulted. He expects that based on his history of two engine problems for the same reason, we should be willing to show better faith and expects a new engine for free." |
| **May 27** | **The Life Flight accident followed a "big, loud pop," then a clattering sound, then a horn indicating an engine failure which would not sustain the helicopter staying airborne.** Also on this date, a Turbomecca technical note distributed in-house concerned cracking on the TU–76 nozzle listed six previous in-flight shutdowns as of December 1992. An increase in "crack rate" over 1990 study. No cracks or shutdowns attributable to the Replacement or New parts. |
| May 27 | Turbomeca Technical Report (Delbert) saying, the crack occurrence may happen at any time along the TU–76 nozzle's lifetime, and may well never happen. 75 of 98 nozzles with cracks examined by Turbo have 2000 hours, or less. |
| **June** | **Turbomeca letter to FAA stating this accident was the seventh incident/accident relating to the TU–76 nozzle. Reported numerous incidents of cracks found during repairs and overhauls, due to a design and manufacture defect that caused rubbing and stress. Appended Service Bulletins which disclosed to Owners that a visual inspection will not disclose cracks but deterioration may be indicated by listening for the rubbing noise while helicopter is on ground.** |
| **June** | **FAA report on this accident. (2482) hours on engine. Barnett had 4,970 flight hours of which 1,400 were from military. He had averaged 100 to 120 Life Flights a year for preceding 3 years. Pilot had not been trained in autorotation without power. Nurse on board was interviewed: Her statement indicated that 10–15 seconds from loud pop, then clattering noise, white light went on left side cockpit, pilot maneuvered "cyclic and collective," and pulled the nose up, then rear of copter struck earth. A** |

witness reported seeing the helicopter just before the accident at 400–500 foot altitude. Report also states "the crack may develop to a complete opening (failure), even if rubbing not detectable.

| | | |
|---|---|---|
| | July | Turbomeca reports to DGAC. In July and August the DGAC issues Airworthiness Directive stating "Deteriorations ... have resulted ... in engine shutdowns." It makes mandatory the check of the module for rubbing noises. |
| | December | Portugal, power loss, emergency landing during take-off. |
| 1994 | February | Accident, following in-flight shutdown, Australia. Turbomeca tells FAA this was accident number 8 involving TU–76. |
| | July | In-flight failure in Italy. |

Other specific facts will be presented in the relevant Point Relied On. Again, the issues now presented are those not raised nor decided upon in *Letz*.

## 1. EVIDENTIARY QUESTIONS INVOLVING:

## A) PRE–ACCIDENT DEFECTS AND B) POST–ACCIDENT REMEDIAL MEASURES.

### A.

■ Turbomeca now asserts that many of the memos and reports shown in the chronology of the facts should have been excluded on relevancy grounds. This case was submitted, in part, for recovery of actual damages in a product liability case, where the plaintiffs were required to show the product was defective and dangerous when put to a use reasonably anticipated by the manufacturer, and plaintiffs sustained damage as a direct result of the defect. For punitive damages, there had to be a showing that the defendant had actual knowledge of the defect and danger at the time the product was sold. *Angotti v. Celotex Corp.*, 812 S.W.2d 742, 751—52 (Mo.App.1991). Turbomeca internal reports and the evidence of other crash information relating to this defective part went to show the danger of the product and to establish the defendant had actual knowledge of the danger. *Angotti*, 812 S.W.2d at 751—52.

### B.

This point is a variation on Point V in *Letz*, the reasoning there is applicable here, so it will not be repeated. There is an additional reason for denial.

■ Exhibit 111 was an Airworthiness Directive issued in the summer of 1993 (see timeline) by the French DGAC and referred to the potential "worsening of this defect," and resulted in a more profound warning to owners of a defect that might cause in-flight shutdowns. Exhibit 177 was an internal Turbomeca memo in December 1993 in which the previous procedure to detect, listening for rubbing noises, was deemed not sufficient. Turbomeca correctly points out that evidence of subsequent remedial measures is inadmissible in negligence actions. *Pollard v. Ashby*, 793 S.W.2d 394, 401 (Mo.App.1990). Turbomeca grudgingly admits, in a footnote at the end of it's Point Relied On, the existence of this court's opinion in *Stinson v. E.I. DuPont De Nemours and Company*, 904 S.W.2d 428 (Mo.App.1995). In *Stinson*, under a strict product liability theory the plaintiff sought to introduce evidence showing the pre-injury warning label on the defendant's product said the product "could cause an allergic respiratory reaction," while the post-accident label "warned of the possibility of permanent lung injury." *Stinson*, 904 S.W.2d at 432. At page 432 this court said the post-accident rule in negligence cases did not apply "... in strict liability cases because: (1) the culpability of the defendant is irrelevant in such actions; and (2) the purposes of the rule would not be served."

■ In this case, where negligence and strict liability were both submitted, the post-accident evidence was relevant for one count,

and, as long as it was not unduly prejudicial to Turbomeca, being relevant for one purpose but not another, the evidence was admissible. *Rodriguez v. Suzuki Motor Corporation,* 936 S.W.2d 104, 109 (Mo. banc 1996); *Tune v. Synergy Gas Corp.,* 883 S.W.2d 10, 15 (Mo. banc 1994). If a defendant wishes to emphasize the limited purpose of the evidence, a limiting instruction may be requested. *Id.* A broad or blanket objection will not suffice when an exhibit is admissible for one purpose and not another. *Crockett by Crockett v. Schlingman,* 741 S.W.2d 717, 718 (Mo. App.1987).

The point is denied.

### 2. INSTRUCTIONAL ERRORS:

### A) IN PROPERLY DEFINING DEFENDANT'S MENTAL STATE, B) IMPROPERLY DEFINING THE TERM ORDINARY CARE, AND C) WITHDRAWING AN ISSUE FROM THE JURY

■■■ A) Turbomeca asserts the exemplary damage instructions given by the trial court were improper as they did not adequately define, nor require a jury to find that "the defendant knew or should have known its conduct created a high probability of injury." The trial court utilized MAI 10.06 which is to be used in cases where exemplary damages are sought where both negligence and strict liability are submitted. MAI 10.06 states that if the jury finds that the acts set out in the plaintiff's negligence and strict liability verdict directors, "showed a complete indifference to or conscious disregard for the safety of others," then the jury could award punitive damages. Turbomeca here contends MAI instructions 10.02 (negligence) and 10.04 (strict liability) should have instead been given. There are several problems with this point. First, both MAI 10.02 and 10.04 contain the language "showed a complete disregard for the safety of others." While this is not exactly the same as the damage instruction given to the jury, the damage instruction given was so sufficiently similar to imply the same direction to the jury that any prejudice would be utterly minimal. Second, Turbomeca's point on appeal regarding the lack of definition as to

scienter or conduct was not properly preserved. The objections at the instruction conference make no mention of this objection now raised on appeal. Turbomeca, in its reply brief, candidly admits any review would be under plain error. The admonition in *Fowler v. Park,* 673 S.W.2d 749, 757 (Mo. banc 1984) as to making the proper objection at the instruction conference, and the reluctance of appellate courts to reverse for errors in instruction without a substantial indication of prejudice, apply here. In addition, Rule 70.03 is clear—"No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds for the objection." Therefore, the court will not grant plain error relief.

■■ B) The next assignment of instructional error concerns the definition of ordinary care. Turbomeca argued for MAI 11.05 which defines the degree of care required of a defendant as what "an ordinarily careful person would use. . . ." The court gave 11.10 II which ". . . means the degree of care, skill and learning that an ordinarily careful expert in defendant's business would use under the same or similar circumstances." Turbomeca states that all cases cited in the Committee Comment for use of this instruction for "Manufacturers of Certain Products," involve defendants who manufactured drugs. The argument is not persuasive. There was extended evidence offered from both sides as to the sophisticated nature of the engineering, dynamics, and production of helicopter engines. The trial court was justified in giving 11.10 II under these facts. Further, Turbomeca puts forth no showing of prejudice. This argument is denied.

■■■ C) Finally, Turbomeca disputes the trial court, pursuant to MAI 34.01, for giving a withdrawal instruction on evidence presented by Turbomeca that Rocky Mountain Helicopters had not performed so-called power checks or engine condition checks every 25 flying hours on the Life Flight's engine. These checks appear to be in the order of regularly scheduled maintenance on all aircraft as compared to the checks for

rubbing noises as described in the service letters and bulletins. The trial court determined from the evidence that the performing of these particular checks would not have divulged anything relevant to the owner of impending power failure based on the *admitted* cause of this accident—the defective TU–76. The purpose and use of withdrawal instructions is to avoid misleading a jury on a specious issue and the giving or refusing of these instructions is up to the discretion of the judge. *Bradley v. Browning–Ferris Industries,* 779 S.W.2d 760, 765 (Mo.App.1989). An abuse of the trial court's discretion is reviewed to determine whether the ruling is clearly against the logic of the circumstances and so arbitrary and unreasonable to shock a sense of justice, thus indicating a lack of careful consideration. *Shady Valley Park & Pool, Inc. v. Weber, Inc.* 913 S.W.2d 28, 37 (Mo.App.1995).

This point is denied.

## 3. TRIAL COURT FAILED TO ALLOW TURBOMECA IN ARGUMENT AND THROUGH INSTRUCTIONS TO ADEQUATELY EXPLAIN TO JURY THE TRIAL WOULD BE BIFURCATED.

Under the auspices of § 510.263, Turbomeca invoked the option for a bifurcated trial.

1. All actions tried before a jury involving punitive damages shall be conducted in a bifurcated trial before the same jury if requested by any party.

2. In the first stage of a bifurcated trial, in which the issue of punitive damages is submissible, the jury shall determine liability for compensatory damages, the amount of compensatory damages, including nominal damages, and the liability of a defendant for punitive damages. Evidence of defendant's financial condition shall not be admissible in the first stage of such trial unless admissible for a proper purpose other than the amount of punitive damages.

3. If during the first stage of a bifurcated trial the jury determines that a defendant is liable for punitive damages, that jury shall determine, in a second stage of trial, the amount of punitive damages to be awarded against such defendant. Evidence of such defendant's net worth shall be admissible during the second stage of such trial.

When this statutory scheme is utilized in a suit involving punitive damages, the first phase of the trial calls for the jury to first determine liability and the amount of compensatory damages, then liability for punitive damages. The second phase, if necessary, allows the jury to determine the amount of punitive damages.

Turbomeca does not claim instructional error such as a failure to use mandatory jury instructions or an improper amendment of jury instructions. Turbomeca here levels two complaints at the trial court for failure to heed the *suggestions* under MAI 35.19. MAI 35.19 contains a sample package of instructions for a trial involving punitive damages, and is contained in the "Illustrations" portion of MAI.

First, Turbomeca points to the following language in the Committee Comment to MAI 35.19: "The trial judge should exercise sound discretion in affording attorneys appropriate leeway during the various stages of trial to describe to the jury the proceedings contemplated by Section 510.263." Turbomeca's claim is that the quoted language is mandatory and should have been the authority to require the court to allow it to explain during voir dire, and in opening statement and closing argument that there would be a phase two and to emphasize the jury was not to award punitive style damages in phase one. The trial court did not allow Turbomeca to pursue this course.

Second, Turbomeca states the judge failed to include the proper and "mandatory" language contained in MAI 35.19: "If you find that defendant is liable for punitive damages in this stage of the trial, you will be given further instructions for assessing the amount of punitive damages in the second stage of the trial."

Turbomeca argues that both these errors constitute an abuse of discretion. The prejudice it claims is the $175 million verdict for compensatory damages. Turbomeca stresses that the jury failed to understand that the punitive damage portion

of the trial was separate, and that it covered different damages. Appellate courts hesitate to overturn an order of a trial court on matters resting within the discretion of trial court. *Forester v. Roddy,* 418 S.W.2d 67 (Mo.1967). The decision to inform the jury of the technical workings of a bifurcated trial was an exercise of judicial discretion and will not be disturbed on appeal in absence of evidence of abuse thereof. *Arno v. St. Louis Public Service Co.,* 356 Mo. 584, 202 S.W.2d 787, (1947).

The court can hardly be faulted for having given MAI instructions. It can not amount to reversible error in this case to fail to heed language in an illustrative instruction. *Northeast Missouri Electric Power Cooperative, v. Fulkerson,* 542 S.W.2d 26, 31—32 (Mo.App.1976). Committee Comments are advisory not mandatory, and prejudice does not follow from a neglect to use them. *Sall v. Ellfeldt,* 662 S.W.2d 517, 524 (Mo.App.1983). Although the court does not recognize reversible error here, certainly the better practice would be to more fully instruct the jury as to the bifurcated proceedings. Even if the jury was misled by the two-phase aspect of the trial, any prejudice is corrected by this court's action taken in point 5 on remittitur.

Turbomeca's claim that the compensatory damages were polluted with punitive damage evidence, is, however, worthy of further mention. Without unduly extending this opinion, a question may remain for legislative consideration. How much should the jury know, and at what stage in the trial should the defendant's conduct and the defendant's wealth be presented? Missouri's bifurcation process where punitive or aggravating damages are sought, is employed, with variations, in California, Georgia, Kansas, Montana, Nevada, New York, Tennessee, Utah and Wyoming.

What our system does is initially shield the evidence of the defendant's wealth from the jury, until there has been a determination that the defendant's conduct merits punitive damages. One commentator has mused, "It is a good guess that rich men do not fare well before juries, and the more emphasis placed on their riches, the less well they fare."

Morris, Punitive Damages in Tort Cases, 44 Harvard Law Review. 1173, 1191 (1931). Though evidence of wealth is delayed, our system allows the jury, in the first phase, to hear evidence on both the issues of liability and punitive damages. *Angotti v. Celotex Corp.,* 812 S.W.2d at 751. As earlier noted, it is only after hearing this evidence that the jury decides liability for compensatory damages, and renders a verdict as to whether to proceed to phase two to determine the amount of punitive damages. Combining a jury's determination of actual damages with liability for punitive damages, after hearing all the evidence on the elements of defendant's conduct, could lead to an inflated amount of compensatory damages. Some states, including Minnesota and North Dakota, have attempted to handle this situation by allowing only purely compensatory evidence at the first stage, then combining punitive damage type evidence and net worth in the second stage. This method does allow the jury to hear the wealth of the defendant along with examples of its conduct. Another alternative, which New Jersey used for a time, calls for a trifurcated proceeding, where compensatory damages are dealt with in the first phase, punitive type conduct is presented in the second phase to determine liability for punitive damages, and, then in the third stage, the defendant's net worth is presented and the amount of punitive damages is determined. Needless to say, the other methods are not without pitfalls and problems such as unduly prolonging a trial.

### 4. NET WORTH EVIDENCE

Turbomeca's next point asserts trial court error in the admission of evidence of its net worth in the second portion of the bifurcated trial where the jury was to consider the amount of punitive damages. Specifically, Turbomeca says Missouri law permits only evidence of the defendant's net worth, and allowing evidence before the jury of gross yearly sales is unrelated to "punitive-type damages."

Section 510.263, which deals with the procedure of a bifurcated trial where punitive damages are sought, first states in subsection two, "[E]vidence of defendant's *financial*

*condition* shall not be admissible in the first stage ....," and then in subsection three, "If during the first stage of a bifurcated trial the jury determines that a defendant is liable for punitive damages, that jury shall determine, in a second stage of trial, the amount of punitive damages to be awarded against such defendant. Evidence of such defendant's *net worth* shall be admissible during the second stage of such trial." (Emphasis added). Turbomeca insists the reference to net worth evokes a legislative intent to limit evidence solely to a net worth figure, and use of any other financial evidence during this stage, is prejudicial error requiring reversal. The trial court allowed the Barnett plaintiffs to introduce two prior years' sales figures of the Turbomeca.

During discovery, Turbomeca submitted a financial report prepared for it showing a 1993 net worth of 591,255,863 francs which translated into $122,565,470. There was additional evidence of $200,369,360 as the net worth figure (assets minus liabilities) which was given to the jury and, over objection the reports 1992 and 1993 sales figures of $498,-373,130 and $474,967,030 were allowed in evidence. Admission of the sales figures is at the heart of this point on appeal.

To support this point, Turbomeca relies primarily on *Gollwitzer v. Theodoro,* 675 S.W.2d 109, 111–112 (Mo.App.1984). In *Gollwitzer* the Eastern District noted the *only* evidence offered by the plaintiff as to determining the proper measures of "affluence and wealth" of the defendant, consisted of gross sales and inventory taken from the defendant's prior tax returns. The opinion noted that admission of gross sales figures does not demonstrate that a profit was had, "and standing alone means nothing." *Id.* Similarly, the court noted inventory figures mean nothing without knowing whether goods on hand were mortgaged, or even if a large inventory equated to a lack of business.

■■■■ Turbomeca's point that the only evidence relevant here is the net worth figure, is not well taken. This language from this court's decision in *Green v. Miller,* 851 S.W.2d 553, 555 (Mo.App.1993) shows the law allows additional evidence other than the assets minus liabilities figure: "When deter-

mining the amount of punitive damages to be awarded, the worth or financial condition of the tortfeasor is a relevant consideration." *See also (Call v. Heard,* 925 S.W.2d 840, 849 (Mo. banc 1996), where the Court referred to the "financial status," of the defendant as being relevant in determination of punitive damages); *Moore v. Missouri–Nebraska Express, Inc.* 892 S.W.2d 696, 714 (Mo.App. 1994). The law does not make irrelevant and inadmissible any evidence of the defendant's "financial status" other than the net worth figure. Under the proscription of Gollwitzer, there was sufficient evidence, including net worth, to support a jury determination of the extent of punitive damages necessary to punish and deter this defendant. The evidence here of sales was admissible, its weight was to be determined by the jury. The point is denied.

## 5. SUBMISSIBILITY AND AMOUNT OF COMPENSATORY AND PUNITIVE DAMAGES

The court now recites the standards for remittitur and determining excessiveness of damages under § 537.090, Missouri's wrongful death act. This section shall apply to Turbomeca's request for new trial and further remittitur of the compensatory and punitive awards.

■■■■ In Missouri, there are generally two situations in which an appeal of an excessive verdict arises: (1) where the verdict is simply disproportionate to the proof of injury and results from an honest mistake by the jury in assessment of the evidence and, (2) where the verdict's excessiveness is engendered by trial misconduct and thus results from the bias and prejudice of the jury. A verdict in the first instance may be corrected by an enforced remittitur and does not require a retrial. A verdict of the second variety is prejudiced and can only be remedied with a new trial. *Young v. Jack Boring's, Inc.,* 540 S.W.2d 887, 897 (Mo.App.1976) (citation omitted); *Coulter v. Michelin Tire Corp.,* 622 S.W.2d 421, 436 (Mo.App.1981), *cert. denied,* 456 U.S. 906, 102 S.Ct. 1752, 72 L.Ed.2d 162 (1982).

Turbomeca argues that both the compensatory damages award and the punitive damages award were the product of trial misconduct and, thus, justify ordering a new trial. The points raised by Turbomeca to support its claims of misconduct are as follows: (1) plaintiffs improperly referred to cost-savings figure and the FAA reports; (2) plaintiffs employed improper videotaping techniques in depositions; (3) counsel's closing argument for plaintiffs was inflammatory and overly emotional; and (4) plaintiffs' counsel indicated to the jury that Turbomeca executives' deposition testimony was inferior to a personal appearance in court. Turbomeca's first claim of misconduct—the referral to the cost-savings figure and the FAA reports—was resolved in Letz, where this court held such evidence was relevant and admissible to show aggravating circumstances. The second, third, and fourth points raised, even assuming they amount to error or misconduct, are not, on appeal, so significant as to require a new trial.

■■■■■■ Whether trial misconduct exists such that it engendered passion and prejudice on the part of the jury is left largely to the discretion of the trial court. *Walton v. U.S. Steel Corp.*, 362 S.W.2d 617, 627 (Mo. 1962); *Skadal v. Brown*, 351 S.W.2d 684, 690–91 (Mo.1961). The trial court had every opportunity to see and observe the conduct of plaintiffs' counsel, and was aware of the circumstances surrounding counsels' actions as well as the general atmosphere of the trial. Based on its observations, the trial court ordered a remittitur of the verdicts, effectively ruling that any alleged trial misconduct did not warrant a new trial. This court sees nothing in this record to indicate that the trial court abused its discretion in failing to grant defendants a new trial because of the aforementioned incidents, whether such are considered separately or cumulatively. Accordingly, with no trial misconduct by plaintiffs' counsel warranting a new trial, remittitur is an appropriate remedy.

■■■■■■ The doctrine of remittitur has long been grounded in our common law. Although the Supreme Court of Missouri abrogated the doctrine in *Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99, 110 (Mo. banc 1985), Missouri's legislature reinstated remittitur soon thereafter. The remittitur statute, § 537.068, was designed to establish equitable compensation and to eliminate, to the extent possible, the retrial of lawsuits. *Bishop v. Cummines*, 870 S.W.2d 922, 924 (Mo.App.1994). Under § 537.068, remittitur is proper only where, "after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict ... exceeds fair and reasonable compensation for plaintiff's injuries and damages...."

■■■■■■ The trial court has broad discretion in ordering remittitur because the ruling is based upon the weight of the evidence, and the trial court is in the best position to weigh the evidence. *Magnuson by Mabe v. Kelsey–Hayes Co.*, 844 S.W.2d 448, 457 (Mo.App. 1992); *Fust v. Francois*, 913 S.W.2d 38, 49 (Mo.App.1995). This court will interfere with an order of remittitur only upon a finding that both the jury's verdict and the trial court's ruling constituted an arbitrary abuse of discretion. *Hall v. Superior Chemical & Fertilizer, Inc.*, 819 S.W.2d 422, 425 (Mo. App.1991); *See also Bishop v. Cummines*, 870 S.W.2d at 923. The trial court will be deemed to have abused its discretion where the remitted judgment is still so excessive as to shock the conscience of the appellate court. *Larabee v. Washington*, 793 S.W.2d 357, 360 (Mo.App.1990); *See also Fust v. Francois*, 913 S.W.2d at 49 (Mo.App.1995).

■■■■■■ Missouri courts have consistently adhered to the rule that a verdict of a jury in assessing damages will not be disturbed unless it is grossly excessive or inadequate. *Sandifer v. Thompson*, 280 S.W.2d 412, 415 (Mo.1955). In determining whether a verdict is grossly excessive, the appellate court reviews the evidence in the light most favorable to the plaintiff. *Sandifer v. Thompson*, 280 S.W.2d 412, 416 (Mo.1955). *See also Triplett v. Beeler*, 268 S.W.2d 814, 819 (Mo. 1954). The ultimate test is what fairly and reasonably compensates the plaintiff for the injuries sustained. *Coulter v. Michelin Tire Corp.*, 622 S.W.2d 421, 436 (Mo.App.1981), *cert. denied*, 456 U.S. 906, 102 S.Ct. 1752, 72

L.Ed.2d 162 (1982); *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1299 (8th Cir.1987).

## A. COMPENSATORY DAMAGES

The jury awarded plaintiffs $175 million in compensatory damages, which the trial court remitted to $25 million. Turbomeca appeals the remitted compensatory award claiming that the trial court erred in denying defendant's motion for a new trial and refusing to further remit the compensatory verdict. Turbomeca claims that the verdict, even as remitted is: (1) grossly excessive, (2) the product of misconduct by plaintiffs' counsel thus demonstrating bias, passion and prejudice of the jury; (3) shocks the conscience of the court, (4) exceeds fair and reasonable compensation, and (5) is unsupported by the evidence.

■ Turbomeca first requests that this court order a new trial arguing that such relief is warranted by the excessiveness of the verdict. Entitlement to a new trial based on the excessiveness of the verdict requires a showing of trial court error. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 872 (Mo. banc.1993); *Larabee*, 793 S.W.2d at 359. The size of the verdict alone will not establish bias, passion, and prejudice of the jury. *Id.* The complaining party must show that the verdict, viewed in the light most favorable to the prevailing party, was glaringly unwarranted and that some trial error or misconduct of the prevailing party was responsible for prejudicing the jury.[7] *Id.*

■ There is no exact formula to determine whether a verdict for compensatory damages is excessive and, of course, each case must be considered on it own merits. *Larabee v. Washington*, 793 S.W.2d at 360, a personal injury case, indicates that in evaluating the excessiveness of an award, the reviewing court should consider the evidence in the case and the verdict in light of the following factors: (1) loss of income, present and future, (2) medical expenses, (3) [decedent's] age, (4) the nature and extent of the injuries, (5) economic factors, (6) awards given and approved in comparable cases, and (7) the superior opportunity for the jury and trial court to appraise [decedent's] injuries and other damages.

Guidance may also be taken from the Wrongful Death Act. The persons entitled to recover under the wrongful death statute are identified in § 537.080.1(1) as the spouse, children, and parents of the deceased—all of whom were plaintiffs below. Wrongful death damages are governed by § 537.090 which provides:

> [T]he trier of facts may give to the party or parties entitled thereto such damages as the trier of the facts may deem fair and just for the death and loss thus occasioned, having regard to the pecuniary losses suffered by reason of the death, funeral expenses, and the reasonable value of services, consortium, companionship, comfort, instruction, guidance, counsel training, and support of which those on whose behalf suit may be brought have been deprived by reason of such death ... In addition, the trier of the facts may award such damages as the deceased may have suffered between the time of injury and the time of death and for the recovery of which the deceased might have maintained an action had death not ensued. The mitigating or aggravating circumstances attending the death may be considered by the trier of facts, but damages for grief and bereavement by reason of death shall not be recoverable.

■ A factor to be considered in evaluating damages under the Wrongful Death Act is potential financial aid by the decedent, which can be shown through evidence of the decedent's health, character, talents, earning capacity, life expectancy, age and habits. *Kilmer v. Browning*, 806 S.W.2d 75, 81 (Mo. App.1991). In computing the loss of consortium for the loss of a parent for a child, or the loss of a child for a parent, factors such as the physical, emotional, and psychological relationship between the parent and child must be considered. *Kilmer*, 806 S.W.2d at 81.

7. See discussion *supra* for analysis of Turbomeca's claim of trial misconduct by plaintiffs' counsel.

Any pain and suffering the decedent may have endured shall also be considered in determining damages. § 537.090. The range between an inadequate award and an excessive award for pain and suffering can be enormous, each case depends upon its own particular facts. *Morrissey v. Welsh Co.,* 821 F.2d 1294, 1301 (8th Cir.1987). Substantial disparity among juries as to what constitutes pain and suffering must be expected. As the Eighth Circuit Court of Appeals stated,

> This is a litigious fact of life of which counsel, clients, and insurance carriers are fully aware. Once they place their fate in the hands of a jury, then they should be prepared for the result....They cannot expect the [c]ourt to extricate them in all cases where the award is higher or lower than hoped for or anticipated.

*Morrissey v. Welsh Co.,* 821 F.2d at 1301(citations omitted).

In light of these general principles of law, a review of the evidence favorable to the compensatory damage award is in order. The purely economic damages attributable to Barnett's death are undisputed, both sides agree that $649,080.00 represents the lost past and future earnings, benefits and household services related to James Barnett's death. As a result, the non-economic losses, when applying the trial court's remittitur of compensatory damages to $25 million, amount to $24,350,920.00 in non-economic damages. The non-economic losses for wrongful death require this court to properly consider the reasonable value of services, consortium, companionship, comfort, instruction, guidance, counsel, training and support, as well as any pain and suffering which the deceased may have suffered. § 537.090.

At the time of his death, James Barnett, Jr., was forty years old and was in good health. His life expectancy was an additional thirty-six years to age seventy six. His salary was approximately $34,000.00 annually. He was an excellent pilot by all accounts and had been employed as a full-time Life Flight pilot for eight years prior to his death. He received flight training in the military and was licensed for commercial flights. He had been married for fifteen years to Julia Barnett, whom he met during overseas military service. The couple had two young children, Jessie (14) and Mia (12), both of whom enjoyed a close relationship with their father. In addition, he had a close relationship with his parents James and Wanda Barnett. A videotape demonstrating the closeness and intimacy of interactions between James Barnett and his family was admitted into evidence.

Additional factors to consider include the pain and suffering of the deceased prior to death and the number of plaintiffs suffering a loss. § 537.090. Testimony of the Chief Medical Examiner of Jackson County who performed the autopsy demonstrated that James Barnett consciously suffered pain for three to five minutes as he bled to death after his thoracic aorta was severed upon impact.

Plaintiffs properly point out that the compensatory verdict considers the economic and non-economic losses to five individual plaintiffs. "[A]n element of the total damages is based upon the relationship between the deceased and each individual party to the action." *Call v. Heard,* 925 S.W.2d 840, 851 (Mo. banc 1996). The fact that each of five individuals who were proper plaintiffs under the Wrongful Death Act demonstrated significant non-economic losses stemming from the death of James Barnett would work to increase the total compensatory award. Under the authority of § 537.068, and having reviewed and weighed the evidence of economic and non-economic compensatory damage and considering the number of plaintiffs, this court finds that the 25 million compensatory award remains excessive and finds that 3.5 million dollars is an appropriate compensatory damage award and orders remittitur accordingly, providing the plaintiffs accept this figure, otherwise a new trial will be ordered.

## B. PUNITIVE DAMAGES

### 1) Refusal to Grant Directed Verdict

Turbomeca also alleges the trial court erred in refusing to grant a directed verdict on the issue of aggravating circumstances and in submitting the issue to the jury because plaintiffs failed to make a submissible case that: (1) Turbomeca knew of the defective condition of the TU–76 nozzle guide vane

at the time the TU–76 left Turbomeca's possession; (2) Turbomeca knew or had reason to know of the high probability that its actions would result in injury; and (3) Turbomeca showed complete indifference to or conscious disregard for the safety of others when they sold or installed the TU–76 nozzle guide vane.

In reviewing the denial of a motion for directed verdict, the evidence presented at trial is viewed in the light most favorable to the non-moving party in order to determine whether or not substantial evidence was introduced which tended to prove facts essential to plaintiff's recovery. *Gamble v. Bost*, 901 S.W.2d 182, 185 (Mo.App. 1995); *Lindsey Masonry Co. v. Jenkins & Assoc.*, 897 S.W.2d 6, 15 (Mo.App.1995). A case should not be withdrawn from the jury unless the facts in evidence and the inferences fairly deductible therefrom are so strongly against plaintiffs that reasonable minds could not differ. *Bridgeforth v. Proffitt*, 490 S.W.2d 416, 423 (Mo.App.1973).

Section 537.090 provides that in wrongful death cases "[t]he mitigating or aggravating circumstances attending the death may be considered by the trier of facts" in assessing damages. In *Bennett v. Owens–Corning Fiberglas Corp.*, 896 S.W.2d 464, 466 (Mo. banc 1995), the Supreme Court of Missouri held that aggravating circumstances damages in wrongful death cases are punitive in nature. Subsequently, in *Call v. Heard*, 925 S.W.2d at 847–849, Missouri's highest court applied a punitive damages analysis in reviewing an award of aggravating circumstances damages under § 537.090, Missouri's wrongful death statute.[8]

The well-established purpose of punitive damages is to inflict punishment and to serve as an example and a deterrent to similar conduct. *Vaughan v. Taft Broadcasting Co.*, 708 S.W.2d 656, 660 (Mo. banc 1986). Submission of punitive damages in a wrongful death case is proper when the defendant could have reasonably been charged with knowledge of a potentially dangerous situation but failed to act to prevent or reduce the danger. *Kilmer v. Browning*, 806 S.W.2d 75, 80 (Mo.App.1991).[9]

In the context of products liability actions, the legal standard for submitting punitive damages depends on whether the underlying theory is in strict liability or in negligence. The trial court submitted both theories to the jury. Under a negligence theory, punitive damages may be awarded if the defendant showed complete indifference to or a conscious disregard for the safety of others. *Stojkovic v. Weller*, 802 S.W.2d 152, 155 (Mo. banc 1991) (citing *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 73 (Mo. banc 1990)). Missouri cases have interpreted "complete indifference to or a conscious disregard for the safety of others" to mean if the defendant knew or had reason to know that there was a high degree of probability that the action would result in injury. *Hoover's Dairy, Inc. v. Mid–America Dairymen*, 700 S.W.2d 426, 436 (Mo. banc 1985); *Sharp v. Robberson*, 495 S.W.2d 394, 397 (Mo. banc 1973). In a strict liability case, punitive damages are properly submitted where (1) the defendant showed complete indifference to or a conscious disregard for the safety of others, and (2) the defendant introduced the offending product into commerce with actual knowledge of the product's defect. *Angotti v. Celotex Corp.*, 812 S.W.2d 742, 746 (Mo. App.1991).

A review of the evidence presented at trial reveals that substantial evidence existed from which the trial court could deter-

8. In *Call v. Heard,* the Supreme Court jettisoned the term "aggravating circumstances damages" for "punitive damages," thereby solidifying its holding in *Bennett* that aggravating circumstances damages are the equivalent of punitive damages. *Baker v. General Motors Corp.,* 86 F.3d 811, 817 (8th Cir.1996). Hence, this opinion, following the Supreme Court of Missouri's opinion in Call, refers to the Wrongful Death Act's aggravating circumstances damages as punitive damages.

9. In *Kilmer v. Browning,* a wrongful death case brought against the landlord and gas company when a tenant died of carbon monoxide asphyxiation, the court held that failing to adequately examine a carbon monoxide venting system, or ignoring the system's defective condition, was indicative of indifference to the safety of others, and justified submitting punitive damages to the jury. *Kilmer v. Browning,* 806 S.W.2d at 80.

mine that plaintiffs had made a submissible case for punitive damages. Testimony by Turbomeca's own officers indicates complete indifference to, and a conscious disregard for, the safety of others. Jean Meliet, a mechanical engineer who has been Turbomeca's Customer Technical Support Manager since 1989, testified at trial that he knew in 1986 or 1987 that a problem caused by moving parts rubbing on non-moving parts were causing a deterioration that resulted in engine shutdowns. (See timeline, June 1986, Saviot report). He agreed that, in 1986, the Saviot report revealed a serious TU–76 problem. At trial, the following dialogue followed:

Q. Now, notwithstanding the fact you know you have a serious problem with the TU–76, you still keep manufacturing ARRIEL engines with the TU–76 modifications in them without making changes; isn't that true, in design?

A. Yes.

Q. And you keep manufacturing them and selling them without changing the metal, correct?

A. Yes.

Q. And literally hundreds and hundreds of these engines with the weak metal get manufactured and sold after June 9 of 1986, correct?

A. Yes.

Q. And that goes out on new aircraft and when people bring their engines back for overhaul, TU–76 with this weak metal gets put right back in them correct?

A. Yes.

Q. And during that period of time the number of these cracks and the ruptures and the incidents and the accidents starts mount in, doesn't it?

A. Yes.

* * * * * *

Q. So, we know a third of these engines with this part in it with a bad metal are coming here to this country, correct?

A. Yes.

* * * * * *

Q. You know anybody within your company, Turbomeca, whoever expressed a concern that due to the TU–76 experience that we'd better recall this because someone is going to get hurt or maybe killed?

A. No.

Meliet was in charge of the first two service letters (See timeline March, 1991 and December, 1992) sent to Turbomeca's customers. He made a conscious decision not to include information of in-flight shutdowns and failures in the letters, nor to advise helicopter owners of the safety situation involved with the modified TU–76 part. Safety, as far as Turbomeca was concerned, was not directly related to the cracks in the TU–76. "The in-flight deterioration of a TU 76 leads only to an in-flight shutdown of the engine. That's all." According to Turbomeca officers, an in-flight loss of engine power did not constitute an emergency, rather they simply stated "the pilot must be in a position to land this helicopter in safety."

At trial, Meliet agreed it would have been a large expense to have the TU–76 replaced, at Turbomeca's cost, in all Turbomeca helicopters world-wide.[10] In addition, Meliet admitted the impetus to extend the time between overhauls (See timeline May 1988) was for better sales, and that it would have been possibly bad for sales to have included the safety concerns connected with the TU–76. The Life Flight helicopter in this case had 2482 flight hours at the time of the accident, thus, had Turbomeca not extended the time between overhauls from 2000 to 2500, the accident in this case would have never occurred.

Alain Calemard, the vice-president for engineering and the technical manager of 670+ persons, including 150 engineers at Turbomeca, admitted the problem of cracking and disintegration around the hub was known to Turbomeca in June 1986, and that this problem led to in-flight failures of engines. He

**10.** Turbomeca officers, Dennis Nichols and Steven Ives both testified that a retrofit of the Replacement (TU–202) during a recall would have cost Turbomeca $17,000 per helicopter, with approximately 2850 helicopters world-wide using the defective TU–76.

admitted that the cracking in the TU–76 developed after relatively few hours of usage, and often occurred prior to "Turbomeca's prescribed limits" for overhaul service. He also said that in 1991, Turbomeca made mandatory for a customer to change another part of the engine—but not this part. Only the French military was advised of the existence of the Replacement part.

The testimony at trial established that a manufacturer has a sales advantage if it can lengthen the time between overhauls, because not only does the helicopter owner pay for overhauls [11], but the helicopter is out of service during that time. Calamard agreed that the May 1988 Turbomeca extension for overhaul from 2000 to 2500 hours (some two years after the 1986 Saviot report), was "significant", and came after " . . . we already knew of a number of failures of the TU 76 standard nozzle guide vane."

Based on Meliet and Calamard's testimony at trial, as well as the testimony of several other Turbomeca officers (see Point B *infra*), there was ample evidence from which the trial court could determine the submission of punitive damages was proper. Denial of the directed verdict and submission of punitive damages was not error. Point denied.

## 2) Remittitur of Damages

Turbomeca next alleges the trial court erred in denying its motion for a new trial and refusing to further remit punitive damages because the judgment: (1) remains grossly excessive, the product of misconduct by plaintiff's counsel; (2) constitutes an excessive fine under the Eighth Amendment; (3) denies the defendants due process; and (4) shocks the conscience of the court and demonstrates bias, passion and prejudice.

 Generally, the decision to award punitive damages is peculiarly committed to the jury and trial court's discretion, and the appellate court will only interfere in extreme cases. *Fust v. Francois*, 913 S.W.2d 38, 50 (Mo.App.1995); *Young v. Jack Boring's, Inc.*, 540 S.W.2d 887, 898 (Mo.App.1976). When a

jury awards punitive damages, "both the trial court . . . and the appellate court review the award to ensure that it is not an abuse of discretion." *Call v. Heard*, 925 S.W.2d at 849. On appellate review, an abuse of discretion is established when the size of the punitive award is so disproportionate to the relevant factors that it reveals improper motives or a clear absence of the honest exercise of judgment. *Id.* at 849 (citing *Beggs v. Universal C.I.T. Credit Corp.*, 409 S.W.2d 719, 724 (Mo.1966)). Only when the amount is manifestly unjust will appellate courts interfere with or reduce the size of a verdict. *Ball v. Burlington Northern R. Co.*, 672 S.W.2d 358, 363 (Mo.App.1984).

 Unfortunately no "punctilious prescription", no brightline test, exists to determine if a punitive damage award is excessive. *Hodges v. Johnson*, 417 S.W.2d 685, 690 (Mo.App.1967). While an appellate court can look to other decided cases for guidance, they are often not determinative, for each case presents its own peculiar facts and circumstances which must be evaluated. *Id.* at 689; see also *Huffman v. Young*, 478 S.W.2d 332, 333 (Mo.1972). It is because of the unique facts and circumstances of each case that no fixed mathematical relation, between the amount of actual damages and the amount of punitive damages, can exist. However, the amount of the punitive award must somehow be related to the wrongful act and the actual or potential injury resulting therefrom. *Call v. Heard*, 925 S.W.2d at 849. If the jury's verdict appears to be grossly excessive, outrageous, or the result of an honest mistake, so as to be obviously disproportionate to the injury shown, it is the duty of the court to modify the verdict. *Cates v. Eddy*, 669 P.2d 912, 920–21 (Wyo.1983); 52 Am.Jur.2d 251.

 Fortunately, juries, even in the most complicated cases, generally achieve good results. It is true, however, that no system is perfect and on occasion a jury will reach an incorrect result in the eyes of all reasonable persons. "[A] jury is not free to award any sum it might choose, however

---

**11.** Dennis Nichols, president of Turbomeca Engine Corp., testified that an overhaul costs a helicopter owner, on average, between $90,000 and $140,000.

large or small, whether from anger, sorrow, prejudice, mistake, or other improper cause." *Cates v. Eddy,* 669 P.2d at 920, 50 A.L.R.4th 821. Although considerable latitude is afforded the jury in arriving at a punitive award, the award must fall within a range, however large, that is acceptable under the Due Process Clause of the 14th Amendment. *Honda Motor Co. v. Oberg,* 512 U.S. 415, 420, 114 S.Ct. 2331, 2334–35, 129 L.Ed.2d 336 (1994).

■■■■ The Supreme Court of Missouri has held that aggravating circumstances damages in wrongful death cases are the equivalent of punitive damages and that due process safeguards are required. *Bennett v. Owens–Corning Fiberglas Corp.* 896 S.W.2d 464, 466 (Mo. banc 1995). Procedurally, the Due Process Clause of the 14th Amendment requires that adequate standards and controls be in place to prevent a punitive damage award from becoming an arbitrary deprivation of property.[12] *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 18–19, 111 S.Ct. 1032, 1043–44, 113 L.Ed.2d 1 (1991). Substantively, a punitive award cannot be so "grossly excessive" in relation to the state's interests in punishment and deterrence that it enters into the "zone of arbitrariness" that violates the Due Process Clause. *BMW v. Gore,* 517 U.S. 559, 568, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996). In *BMW,* the United States Supreme Court set out three guideposts for determining when a punitive damages award is so excessive as to violate a defendant's due process rights: (1) the degree of reprehensibility of the defendant's conduct, (2) whether there is a reasonable relationship between the punitive damages award and the harm that has either occurred or is likely to result from the defendant's conduct, and (3) the difference between this remedy and the civil or criminal penalties authorized or imposed in comparable cases. *Id.* at 574–75, 116 S.Ct. at 1598–99, 1602. *See also TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 459–460, 113 S.Ct. 2711, 2721–22, 125 L.Ed.2d 366 (1993).

■■■■ With these cases in mind, this court must both: (1) review the court's remittitur under the guideposts set forth in *BMW,* to determine if the punitive award remains grossly excessive so as to violate due process; and (2) review the remitted amount under the factors set out in Missouri's case law, to determine if the trial court's remittitur constitutes an abuse of discretion so as to require further remittitur or a new trial.

■■■■ The constitutional inquiry begins by looking at the reprehensibility of the defendants' conduct. *BMW v. Gore,* 517 U.S. at 574, 116 S.Ct. at 1599. Reprehensibility is perhaps the most important indicium of the reasonableness of a punitive damage award. *Id.* A review of the trial testimony of Turbomeca's own officers reveals the degree of reprehensibility of the defendants.

Albert Ducrocq, the vice president of Turbomeca's "Airworthiness Department," [13] admitted, like Meliet and Calamard, that the cracks in the TU–76 were due to "thermal fatigue," and that the rubbing of the hub against the turbine could cause an engine to sustain a power loss or shutdown in flight. He further admitted that "[t]he TU–76 doesn't achieve what we would want as a goal for [a] reliable part." In spite of this admission, Ducrocq then testified that an in-flight engine shutdown, caused by a defective TU–76, would not render the engine "unairworthy," but rather *might* create a "potential[ly] dangerous situation."

This obvious failure by Turbomeca's officers to recognize the severity of the situation was further illustrated by its repeated decision to not report in-flight engine failures to the helicopter owners, or the FAA, even though the in-flight failures warranted critical internal reports. In response to questions about incidents not reported to the FAA or the DGAC, Ducrocq replied in one such case, where Turbomeca's internal report stated that a locking engine caused "a brutal whiplash in power," that the occurrence was merely "a malfunction," but "... not neces-

---

12. Because Turbomeca does not argue on appeal that Missouri's standards and controls are so inadequate as to violate due process, this issue is outside the scope of this opinion.

13. Turbomeca's Airworthiness Department manages the "airworthiness" of all engines in service and reports to the FAA and its French equivalent, the DGAC.

sarily what we call an incident." Ducrocq was later asked about the May 26, 1993, Phoenix TV station incident (see timeline— this was the second failure of this particular engine), and could not give a reason why this event, though causing an internal Turbomeca report, would not merit its listing in answer to the FAA inquiry.[14]

The following questions and answers are illustrative of Turbomeca's senior safety person's forthrightness, engineering acumen, and attitude toward the situation created by the modified part:

Q. And would you agree that if the pilot hears a loud bang coming from the engine compartment, it is prudent to make a precautionary landing?

A. This is left to his own judgment.

Q. Well, a loud bang from the engine compartment is not something that a pilot would normally hear within the normal flight parameters of the aircraft, correct?

A. I—I have no idea what is a loud bang.

Q. ... these engines are not supposed to create a loud bang in flight, are they?

A. I—I know this engine running in test status, not on helicopter. So, I can't make any judgment about the noise it can produce once they're installed.

Q. Yes, sir, but you've never heard in the test situation a normal engine make a loud bang as described here, have you?

A. A loud bang in the test cell would be judged unnormal.

After several more questions Ducrocq then admitted the failure was due to the same problem that caused the accident in this case. Ducrocq also testified that many of the occurrences not reported to the FAA were reported to the French DGAC.

The reprehensibility of Turbomeca's conduct is unparallelled, considering that Turbomeca knew the TU–76 was defective and had discussed incidents resulting from the TU–76's failure internally, but did not find it necessary to either: inform the helicopter owners of the in-flight failures, notify the FAA of such incidents, or conduct a recall of the defective TU–76 part.

From the evidence it can easily be inferred that Turbomeca's decision-making was motivated solely by economics. The crash in this case, plus the two failures in February and July of 1994, prompted a Turbomeca meeting, in the summer of 1994, at the home office "... to ask ourselves, why does this keep happening." The following colloquy about the meeting is now recounted:

"Q. And Mr. Ducrocq, in evaluating the situation, certainly you all discussed what other options had been in the past available to the company and what options were still available, true?

A. True.

Q. One of the options that had been available from the beginning with respect to [the] TU–76 was something we had discussed before and that is to plainly and simply remove it at the earliest opportunity, right?

A. That's a possible action.

Q. Did anyone at that committee express any regret or concern that that particular remedial action had not been taken before hand, sir?

A. Not that I remember."

In fact, according to the head of Customer Support, the decision was made in 1991 to offer the Replacement part only to certain owners, but no replacement would be installed in U.S. helicopters, "until the engine [was] taken to a repair facility."

With knowledge that there were 1300 to 1400 TU 76's in use worldwide, of which 200 were in use in the United States, the meeting of the executives resulted in a decision to not

---

14. A third event not reported was the May 22, 1993 incident in Houston where the pilot heard a "loud bang," and made a precautionary landing. The fourth event not reported was the February 15, 1993 Virginia incident where, on the return flight, after the pilot heard a loud bang, power fell to 83 percent, and after another bang power went to 51 percent, prior to a forced landing. Again, this event was the subject of an internal report, but not included in the June report to the FAA. The same holds true for the very first accident involving the modified TU–76 where there was an in-flight failure in the Congo. (see timeline June–July 1985).

recall the parts and to wait until the scheduled overhaul to change the defective part. During overhaul the helicopter owner, rather than Turbomeca, is responsible for paying for any replacement parts. As a result, Turbomeca could avoid the cost of replacing the defective TU–76's during a recall, and instead could charge the owner for the replacement nozzle guide vane while overhauling the engine.[15]

In an attempt to justify the decision to not recall the TU–76, Ducrocq testified that a mandatory recall and replacement, was "... not necessary because the other actions which were put in place have proven efficient." However, he then admitted that had the replacement part been on the life flight helicopter in this case, Barnett would have been alive. The "other actions" that Ducrocq found to be "efficient" consisted of a series of service letters and bulletins sent to the helicopter owners to suggest that the owners listen for "rubbing noises" before and after shutdown of the engine. In reality, these service letters did little to inform the owners of the seriousness of the situation and nothing to inform them that the TU–76 was defective or that it could result in an in-flight engine failure.

Steven Ives, the manager of Technical Services for Turbomeca Engine, as well as several others who testified, have never personally heard the "rubbing" noises mentioned in the service letters and bulletins. In addition, none of Turbomeca's officers could state that any pilot, mechanic, owner, or accident report had ever mentioned hearing a rubbing noise.

Dennis Nichols, president of Turbomeca Engine,[16] testified that he became aware of the problem in 1991, the date of the first service letters, and that prior to May 27, 1993, North American customers were advised of the problems with the TU–76 through the service letters and bulletins. His testimony was as follows:

Q Well sir we can go through the service letters and service bulletins as much as you like, and I invite you to look at them. They're right in front of you. But did they ever tell the customer that the TU–76 nozzle guide vane is defective and dangerous and could result in in-flight power failure?

A. I don't believe that I have read words of that nature in any of the documents.

Q. But that's true isn't it?

A. It's inappropriate for me to—I'm not a technical expert. I—I can't say that.

\* \* \* \* \* \*

Q. Well, do you know, as president of the corporation, whether it's true or not that the TU–76 nozzle guide vane is a—defective component?

A. Would you state the question again, please?

Q. Do you know as president of Turbomeca Engine Corporation whether the TU 76 nozzle guide vane is a defective component?

A. Yes.

Q. And did you know that it was defective before May 27, 1993?

A. I—I can't say.

Nichols agreed that one possibility to have corrected the problem as quickly as possible would have been for the company to recall the engines and retrofit them with the Replacement (TU–202) at Turbomeca's expense. He also admitted that waiting for an overhaul, or increasing the time between over-

**15.** As discussed, *supra,* another indication that Turbomeca was motivated solely by economics was Turbomeca's decision, in spite of Nichols testimony that increasing the time between overhauls would increase the chance of TU–76 failures, to extend the length of time between overhauls in order to gain a sales advantage over competitors.

Steven Ives stated that the owner would pay for the retrofit of the New or Replacement part, unless Turbomeca of France consented. Somewhat contrary to who bore the cost of replacing the modified TU–76s, Ives then said that if the customer brought in a defective nozzle guide vane, Turbomeca had a policy by which it would pay for the retrofit. However, Ives knew of no service letter or of any correspondence sent by Turbomeca or Turbomeca Engine to any of its customers explaining that this policy existed.

**16.** Turbomeca Engine supports and maintains all Turbomeca aircraft in North America, about one third of the world-wide fleet.

hauls, would increase the chance of TU–76 failures.

Q. ... [N]ow the reason that ... Turbomeca ... took the position that we're going to wait until overhaul time and take the chance of failure in the interim of some of these part, is one of cost, isn't it?

A. I agree with that statement.

In July, 1994, the time of the Nichols deposition, he was asked if any decision had been made on the remaining aircraft for a recall, and he answered, ... "there's been no decision."

Steven Ives investigated the crash in this case, as well as the one the day before in Phoenix and gathered the documents for the National Transportation Safety Board, ("NTSB") which had requested the number of previous failures. Like Nichols, he testified there were still engines "out there" flying with the defective TU–76 part. According to the service bulletins, it would take but two hours of a mechanic's time to install the Replacement on the Life Flight helicopter. Neither Ives nor anyone else at Turbomeca Engine told any owner or operator, including Rocky Mountain, that there was a defective part in these engines that created a potentially deadly situation.

Neither Ives, nor anyone else at Turbomeca Engine, questioned Turbomeca about TU–76 problems world wide. It was only after the accident in this case, coupled with the requests of the two U.S. agencies, that a comprehensive compilation was prepared. Ives admits to thirteen world-wide accidents or forced landings, all caused by the TU–76 part, occurring prior to the accident in the case at bar. He admitted this was an important number, and that it did not correspond with the figure of six priors as reported by Turbomeca to the FAA and NTSB.

Carey Brown, Turbomeca Engine's director of customer support, and Ives' superior, testified as follows,

"Q. Mr. Brown, when did you first become aware of any ... problems ... associated with the ... TU–76?

A. I don't know when I first became aware ...

Q. Was it before the crash of Life Flight?

A. I was not aware of any ongoing problems ...

\* \* \* \* \* \*

I still do not myself know that the nozzle was the—problem."

Then when asked what he did when problems were discovered, he said, "I did—basically, when the various service letters came out, we simply administered those service letters."

\* \* \* \* \* \*

Q. And you did not have any knowledge as to either the severity or widespread nature of the TU–76 problem; is that correct, sir?

A. That's correct.

Q. Do you have a mechanical background, Mr. Brown?

A. Yes, I do.

Q. Do you have enough mechanical background to know that a failure of the TU–76 nozzle guide vane could lead to a catastrophic crash?

A. No, I don't.

Q. That's not something within your knowledge as the director of the customer support department?

A. No, it's not.

\* \* \* \* \* \*

Q. Did Turbomeca Engine Corporation ever notify its customers about a potential problem with the TU–76 design, sir?

A. I am still confused by the question.

Q. Well, did you or did you not send out any information or alert to your customers that these things were cracking and had the potential to kill or seriously injure people?

A. No.

Brown had not read the NTSB report, nor was he familiar with anything specific pertaining to the TU–76 problem.

Q. Well, with all of that in mind, Mr. Brown, I'm wondering as the director of technical support for this entire corporation, what is it that you do?

A. I manage the department.

Given the testimony of Turbomeca's own officers, it is not difficult to understand why a large punitive damage amount was awarded. Turbomeca's conduct was unquestionably reprehensible.

The second indicium of a grossly excessive punitive award is its ratio to the actual and potential harm to the plaintiff. *Id.* at 580, 116 S.Ct. at 1601. The trial court's remittitur of $87.5 million in punitive damages, and to $25 million in compensatory damages exhibits a ratio of just over 3:1. For only illustrative purposes, it is noted the Supreme Court of the United States previously approved a ratio of 526:1 as not being in violation of the Due Process Clause of the 14th Amendment in *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462, 113 S.Ct. 2711, 2722–23, 125 L.Ed.2d 366 (1993). While such a ratio might not be proper here, it is evident there is no pre-set or magic ratio of actual to punitive damages. This court concludes that the trial court's remittitur evinces a "reasonable relationship" between actual and punitive damages given the nature of Turbomeca's conduct. *BMW v. Gore*, 517 U.S. 559, 580, 116 S.Ct. 1589, 1601, 134 L.Ed.2d 809 (1996).

Finally the third factor in determining whether a punitive damage award violates the Due Process Clause is the difference between this remedy and the civil or criminal penalties authorized or imposed in comparable cases. *BMW v. Gore*, 517 U.S. at 575, 116 S.Ct. at 1599. Given the testimony of Turbomeca's officers and the other evidence presented at trial, it appears that the punitive damage award given was the only real way to deter the conduct of Turbomeca. The evidence has demonstrated that Turbomeca's decisions were solely based on economics. In addition, it could not reasonably be said that Turbomeca did not have adequate "notice" of the severity of the sanction that might befall them as a result of their conduct. The aforementioned testimony reveals this fact.

■ To supplement the requirements set out above for the imposition of punitive damages, the courts of this state have identified a variety of factors, a nonexclusive list, that should be considered in determining whether the trial court abused its discretion in not further remitting the jury's punitive award. Several factors may be considered, including: (1) the degree of malice or outrageousness of the defendant's conduct, *State ex rel. St. Joseph Belt Ry. Co. v. Shain*, 341 Mo. 733, 108 S.W.2d 351, 356 (1937); (2) aggravating and mitigating circumstances, *Beggs v. Universal C.I.T. Credit Corp.*, 409 S.W.2d 719, 724 (Mo.1966); (3) the defendant's financial status, *Id.* at 724.; (4) the character of both parties, *Maugh v. Chrysler Corp.*, 818 S.W.2d 658, 662 (Mo.App.1991); *Holcroft v. Missouri—Kansas—Texas RR Co.*, 607 S.W.2d 158, 164 (Mo.App.1980); (5) the injury suffered; *Moore v. Missouri–Nebraska Exp., Inc.*, 892 S.W.2d 696, 714 (Mo.App.1994); (6) the defendant's standing or intelligence, *Id.*; (7) the age of the injured party, *State ex rel. St. Joseph Belt Ry. Co.*, 108 S.W.2d at 356; and (8) the relationship between the two parties. *Call v. Heard*, 925 S.W.2d at 849 (citing *Moore v. Missouri–Nebraska Exp., Inc.*, 892 S.W.2d 696, 714 (Mo.App.1994)). Each of these factors has been addressed in the discussion above.

It is a fact, a sad fact gleaned from *all* witnesses, that this accident resulted from the defect in the modified TU–76. Had the replacement TU–202 been installed, the module that used a different metal, there would have been no "metal fatigue" leading to the failure. What Turbomeca's own records, and indeed the early conclusions of their engineers show, is the fatigue or stress was brought on by a flight, followed by a short wait, and then a return trip (see time line incident February, 1990)—exactly the scenario for air rescue or air transport of fragile patients in need of emergency care. Turbomeca advertised the use of this helicopter for emergency medical transport. Turbomeca's reliance on experienced pilots being able to autorotate to a forced landing in such unexpected emergency situations as loss of power, with such a cargo, is void of any support and totally unrealistic.

Turbomeca's post-accident under-reporting of prior failures of the modified TU–76, however, pales in comparison to the lack of forthrightness to its customers. Turbomeca's failure to be candid with owners about the well-

documented dangers of their product, was evidenced by the diversionary tactic of directing persons to listen for rubbing sounds. The company always seemed to be motivated by cutting costs, saving money and increasing sales—all at the expense of the unlucky owners. The TU–76 was modified to save money. The New and Replacement parts took longer to implement for some customers than to build the entire original engine because of "being blocked" by its Commercial Sales Department. Its laissez-faire attitude of never notifying, even post-*Letz* and *Barnett*, owners of the lethal, undetectable dangers inherent in the modified TU–76, along with its net worth and financial ability justifies the imposition here of substantial punitive damages.

While this court concludes that the remitted judgment of $87.5 million entered by the trial court is excessive, the court finds in light of the relevant factors and considering all the evidence, and giving deference to this court's unanimous opinion this day in *Letz*, that $26.5 million is the amount to be rendered against Turbomeca as punitive damages in this case. Considering the extreme reprehensibility of Turbomeca's conduct and the other relevant factors, this court does not believe this punitive award, as now remitted, is grossly excessive as to violate the Due Process Clause of the 14th Amendment.

### THE BARNETTS' CROSS APPEAL— THE STATUTORY CREDIT

The relationship between this case and Letz, and the reason both decisions are being handed down the same day, is exemplified by the cross-appeal of the plaintiffs. The overarching question here is whether, under § 510.263.4, a trial court may grant a punitive damage credit in a second case, for punitive damages awarded, but not yet paid, in a prior case, that arise out of the same incident, when the prior case is on appeal?

The facts vis-a-vis a credit are as follows. The Barnett trial started in June of 1995. In *Letz*, which was tried first, an amended judgment was entered in August 1995. Turbomeca subsequently appealed and the case was heard by this court en banc. As the reader will remember, there was no bifurca-

tion of compensatory and punitive damage awards in *Letz*. After the verdicts in Barnett, Turbomeca timely filed for a punitive damage credit under 510.263.4. Since the *Letz* verdict was not bifurcated, the Barnett trial court determined one-half of the $70 million judgment was punitive, and accordingly, applied a $35 million credit to the remitted Barnett punitive damage award. The Barnetts' primary basis for appealing Turbomeca's punitive damage credit is that no punitive damages award has been paid by Turbomeca in *Letz*.

The confusion caused by this point is due to the language of the statute, which simply does not envision the situation in this case— where there are separate trials, one soon after the other, with the same facts and the same aggravating circumstances, and both cases pend on appeal. Section 510.263.4 states in pertinent part:

> Within the time for filing a motion for new trial, a defendant may file a post-trial motion requesting the amount awarded by the jury as punitive damages be credited by the court with *amounts previously paid* by the defendant for punitive damages arising out of the same conduct on which the imposition of punitive damages is based. At any hearing, the burden on all issues relating to such a credit shall be on the defendant and either party may introduce relevant evidence on such motion. Such a motion shall be determined by the trial court within the time and according to procedures applicable to motions for new trial. If the trial court sustains such a motion the trial court shall credit the jury award of punitive damages by the *amount* found by the trial court to have been *previously paid* by the defendant arising out of the same conduct and enter judgment accordingly. (Emphasis Added).

Paraphrased, the other pertinent portions of this subsection require the trial court to deny the credit if it finds: 1) that the defendant failed to establish entitlement to a credit or, 2) the conduct in the second case was not the same conduct on which the imposition of punitives was based on in the prior case, or 3) that the defendant unreasonably continued [its] conduct after acquiring actual

knowledge "of the dangerous nature of such conduct . . . [17] § 510.263.4.

The Barnetts ask for a strict construction of the statutory language, and argue that the statute requires that after thirty days following entry of judgment if the prior judgment has not been paid, then no credit may be allowed in the second suit.[18]

Somewhat surprisingly, there are very few cases that have interpreted § 510.263.4. This may, in part, be due to the numerous pitfalls and snarls encountered with implementation of the statutory credit. For example, consider what happens if no appeal is taken in *Barnett,* and *Letz* is appealed and results in a punitive award other than $26.5 million. Such a situation, when interpreted under § 510.263.4, would result in confusion because Barnett would then become the first judgment paid. As a result, *Letz,* which then becomes the second judgment, could not receive a credit for Barnett since the defendant in *Letz* did not apply for a credit as required by the statute—within 30 days after entry of judgment. The defendant in *Letz* never applied for a credit because it was the first case tried and there was no reason to ask for a credit at that time. This possible scenario would unwittingly force a defendant to illogically apply for a credit that does not exist at the time it is sought, and may never come into existence. In addition, even if Letz resulted in a higher punitive award than Barnett, the defendant could not, under the statute, obtain a credit for the amount paid in Barnett.

As has been stated earlier in this opinion, the purpose of punitive damages is to inflict punishment and deter similar misconduct and not to allow punishment over and over again for the same previous conduct. Punitive damages are not to reward plaintiffs, but to punish and deter defendants. *Menaugh v. Resler Optometry, Inc.,* 799 S.W.2d 71, 75 (Mo.banc 1990). To allow excessive financial punishment invites a constitutional due pro-

cess violation. In *Elam v. Alcolac, Inc.,* 765 S.W.2d 42, 231 (Mo.App.1988), a case involving numerous plaintiffs who were damaged by the defendant's noxious emissions, the court upheld the defendant's liability for actual and punitive damages, but reversed only for the purpose of adjudicating the proper amount of damages. The court in *Elam* said: "It is a desideratum of the statute [S. 510.262.4] that a defendant not be required to pay redundant punitive damages based on the same conduct."

 The long and short is that the statutory credit under § 510.263.4 just won't adjust to these facts where two cases pend and are ripe for adjudication in one court at the same time. The statute's language allows a credit to be given only for "amounts previously paid." Rather than attempt to make the statute fit by allowing a larger judgment in Barnett and a "conditional" credit when and if *Letz* is paid, the court feels the overall effect of both cases and the remitted amounts of punitive damages in *each* case, when combined, reach the proper result and supply the relief that the credit statute envisions and the United State's Supreme Court has enunciated: that total punitive damages, where there are successive suits, will not go beyond due process limits in punishment and deterrence. As the Appendix shows, Turbomeca will have to pay a total of $26.5 million in punitive damages in each for *Letz* and Barnett. These amounts, when considered together are deemed sufficient to judicially accomplish a total result that is not excessive, nor unduly harsh by repeated punishment. The trial court's granting of a credit on the cross-appeal is reversed.

 The wrongful death statute allows the jury to consider both aggravating and mitigating circumstances. § 537.090. Missouri courts have long held that mitigating circumstances are a factor appellate courts must consider when remitting the trial court's judgment. *Moore v. Missouri—Nebraska, Inc.* 892 S.W.2d at 714 (Mo.App. 1994); *Beggs v. Universal CIT Credit Corp.* 409 S.W.2d at 724 (Mo.1966). In reviewing

---

**17.** It appears that Missouri's statutory credit mechanism is unique. Georgia at one time had a credit legislation. Offering a credit is an alternative to caps on punitive or aggravating awards. The Missouri General Assembly should not be criticized for allowing, but not mandating, a credit to avoid redundant punishment.

**18.** Section 510.263.4 requires the post-trial motions to be filed within the time for filing a motion for new trial. Rule 78.04 states that such time will not exceed 30 days after entry of judgment.

the jury's verdict, the trial court, as well as the appellate court, must consider both previous and pending judgments against the defendant as mitigating circumstances when the prior judgment was for the same conduct as the conduct at issue before them. The burden is on the defendant to establish that previous or pending punitive damage judgments against the defendant result from the same conduct at issue in the present case. The defendant is certainly in the best position to know of previous or pending judgments against them. By giving consideration to other judgments upon a request for remittitur, the appellate court can in the spirit of § 510.263.4, effectuate the goal of the credit statute—to prevent repetitive punitive awards for the same conduct.·

The court realizes trial judges may be put in an unenviable position where a credit is timely requested by a defendant and other cases involving judgments against the same defendant are still pending. However, under these types of circumstances, where the statute does not apply, judges should attempt to use discretion in affording relief to keep punitive awards within due process limits. The legislature is encouraged to immediately revisit § 510.263.4.

Except for the points on the excessive amounts of compensatory and punitive damages, all of Turbomeca's points are denied. The trial court's grant of a $35 million credit is reversed. If the Barnetts agree, within fifteen days of this court's mandate, to remit the total judgment against both defendants for compensatory damages to $3.5 million, and of punitive damages to $26.5 million, this judgment shall stand as of the date of the original date of judgment. Otherwise, that judgment is reversed and remanded for a new trial on damages.

All concur.

## APPENDIX

| | Letz | | Barnett | |
| --- | --- | --- | --- | --- |
| | Actual | Punitive | Actual | Punitive |
| **TRIAL COURT** | | | | |
| Jury's verdict: | combined | $70 m | $175 m | $175 m |
| Judgment after Barnett Trial Ct's Remittitur: | | | $25 m | $87.5 m |
| Barnett Trial Ct's damages allocation to determine Credit [19]: | $35 m | $35 m | | |
| Trial Ct's Punitive Damage Credit: | | | | − $35 m credit |
| Net Judgment after Trial Ct's Credit: | | | $25 m | $52.5 m |
| **APPELLATE ACTION** | | | | |
| Mandate Amount after the Court's Remittitur: | $2.5 m | $26.5 m | $3.5 m | $26.5 m |

Total Payment by Turbomeca under Letz and Barnett decisions: **$59 million**

---

19. Because the *Letz* trial occurred prior to the Supreme Court's decision in *Barnett*, the *Letz* jury did not render separate compensatory and punitive damage verdicts. As a result, the *Barnett* trial court, in order to determine the punitive damage credit under § 510.263, attempted to determine the portion of the combined $70 million verdict in *Letz* that constituted punitive damages.